# Case No. 8,086.

## The LARCH.

[3 Ware, 28.] [1]

District Court, D. Maine. Aug., 1855. [2]

MARITIME LIEN — PART OWNER AND MASTER'S ADVANCES AND DISBURSEMENTS—ADMIRALTY JURISDICTION OVER ACCOUNTS — LIBEL TO SETTLE ACCOUNT.

1. A part owner of a vessel, when the other part owners are present. has no authority to charge them by ordering repairs without their consent.

2. But when a part owner is in possession he has that authority. when the vessel is in a foreign port and the other owners are absent.

3. In the latter case, he has a lien for his disbursements on the other owners' shares which he may enforce by a libel in rem in the admiralty.
[Cited in Pettit v. The Charles Hemje. Case No. 11,047a. Disapproved in The H. E. Willard, 52 Fed. 388.]

4. The admiralty has no jurisdiction over matters of account, merely as accounts, although it

---

may have jurisdiction over all the items in the account.

[Cited in The C C. Trowbridge, 14 Fed. 876.]

[Cited in Swain v. Knapp, 32 Minn. 432, 21 N. W. 416.]

5. If it is apparent from the pleadings, that the main object of the libel is the settlement of the account, the libel will be dismissed.

[Cited in The Saginaw, 32 Fed. 176.]

6. If the accounts arise incidentally in the cause, then it is a question of sound discretion, whether the court will proceed with the cause. If the accounts are simple, consisting merely of offsets, the court will strike the balance and give judgment for that. If they are multifarious and involve the settlement of intricate questions of law or equity, which more properly belong to another forum, the libel will be dismissed.

[Cited in The John E. Mulford, 18 Fed. 458, 459.]

In admiralty.

Gen. Fessenden, for libelant.

W. P. Fessenden, for claimant.

WARE, District Judge. The libelant being the owner of one moiety of the brig Larch, in 1851, with one Fall the owner of the other moiety, it was mutually agreed between them that the libelant should take the brig and employ her on shares, upon the common terms on which vessels are so employed, the owner to keep her in repair, the employer to victual and man her at his own expense, the port charges to be paid one-half by him, as employer, and the other half by the owners, and the net earnings to be divided equally between the owners and the employer. Under this agreement, the libelant will be entitled to three-quarters of the earnings, one-half as employer and charterer, and one-quarter as part owner, and Fall to the other quarter. The brig appears to have been successfully employed up to August, 1854, in the coasting trade. She then took out a register and went to Pictou, Nova Scotia, and took in a load of coal for Nantucket. And here commenced a series of misfortunes which have been the occasion of this libel. She was found when loaded to leak considerably, not, however, so much but that she started on her return voyage; but having, unfortunately, got aground, the leak increased to such a degree that she was obliged to transship her cargo, and she returned for repairs. And it was not until after a series of mischances and hardships, continued from October 19, to the latter part of January, that she was able to return to her home port. A particular detail of these misfortunes is unnecessary to a correct understanding of the case, as it is not pretended that they are imputable to any want of skill or prudence on the part of the master, but were purely fortuitous. But one additional fact should be noted, as it may give a material coloring to the legal aspect of the case. The vessel when she started on her voyage for Pictou was undoubtedly unseaworthy. Her immediately preceding voyage had been to the Southern States for a cargo of lumber, in which she was materially injured in her bottom by worms, but this was unknown by the master and owners. And another fact may be mentioned which quite as materially affects the equitable aspect of the case; that while these repairs were being made, or soon after, Fall sold his moiety to the claimant and insolvent vendee, who will take the vessel with the benefit of all these repairs and leave the libelant practically remediless, or to seek a remedy through doubtful litigation. During this period the libelant was subjected to expense for repairs, wages, and board of the crew, and the loss of his own time, according to the schedule rendered, of $5149.74. It is charged in the libel, that these disasters and losses were occasioned by the unseaworthiness of the vessel when she started on her voyage for Pictou. The libel is brought to enforce a lien on the vessel to answer for damages occasioned by the fault of the vessel.

The demands embraced in the libel are various in their character. The evidence to sustain them has not been produced, and the question in this stage of the case is, whether a libel will lie in the admiralty for any part of them. If it will, the libel ought not to be dismissed, but the cause should proceed and the question be determined hereafter for what part of his claim he has a lien on the ship. The legal relation of the libelant to the ship was of a very complex character. He was master, part owner in possession, and ship's husband, and charterer of the moiety against which he is seeking satisfaction. And if in any of these relations he has a claim against the ship for any part of his expenditures, this libel may be maintained. His claim in each, has been presented by the counsel in a learned and able argument, and by a thorough and critical examination of the decided cases as well as of the general and acknowledged principles of law. By insisting on his rights in one of these characters, he does not waive those in another; but as part owner in possession, he presents, perhaps, the strongest claim. By the general maritime law, and as it stood in the earliest ages and is now generally received, that he had a right to order these repairs and charge the vessel for them, is beyond controversy. Emerig. Contrats a la Grosse, c. 4, §§ 4, 5. The authorities quoted by Emerigon place it beyond doubt. We have adopted that law with some modifications, but those which will not, I think, exempt a part owner in this case. In Abbot on Shipping (part 1, § 4, p. 105, 5th Am. Ed.) it is said, that one part owner may render his companion liable for the cost of repairs unless this liability is expressly provided against. He is confirmed by Chancellor Kent in his Commentaries. The law, he says, presumes that a part owner in possession is invested with authority, by the other part owners, to order

all that is necessary for the preservation and employment of the vessel. 3 Kent, Comm. 155. Story gives it as his deliberate opinion, as best supported by reason, if not authority, that a part owner in possession, is authorized to bind the other part owners, by ordering on the common credit, proper repairs and necessary outfits for the voyage, though a diversity of opinion on this subject has been expressed both in this country and England. Story, Partn. §§ 442–444; Doddington v. Hallet, 1 Ves. Sr. 497; Ex parte Young, 2 Ves. & B. 242; Ex parte Harrison, 2 Rose, 76; Mumford v. Nicoll, 20 Johns. 611. Nicoll v. Mumford, 4 Johns. Ch. 522. This is in case the other part owners do not expressly dissent. Without going into an exhausting examination of the contradictory and irreconcilable cases, I rely on the opinions of three of the most celebrated maritime jurists of the age.

These authorities apply only to the personal liability of the part owners, and this is a suit in rem. But the libelant was not only part owner; he was ship's husband and master. And it is a principle acknowledged in all our books and too well settled to be brought into controversy, that the contract of the masters in a foreign port for repairs, binds the ship itself. There can be no doubt that the material men and mechanics would have a lien on the vessel. Though in the Roman law, from which, as is generally supposed, the maritime law adopted these privileged debts, the lenders of money to pay them only are mentioned, yet by a stronger reason the rule will apply to the original furnishers. Emerig. Contrats a la Grosse, c. 12, § 4. And as the master advanced this, I can see no reason why he should be placed in a worse situation than a stranger. Besides, by the general maritime law, and as it is received by all the maritime nations of continental Europe, this is the only pledge which the creditor has. The master's power to bind the owners is confined to the ship and her fruits, and he has none to bind them personally. The Rebecca [Case No. 11,-619]. Besides, the peculiar nature of these privileged debts is to be taken into account. The creditor, who trusts the thing rather than the person, is considered as parting with his property only on condition that the price is paid. Domat, liv. 3, tit. 1, § 5, No. 6. He has therefore a jus in re, a proprietary interest, and the thing itself is hypothecated to him; and this hypothecary right can be lost only by his own laches. To this may be added that the libelant was in possession and had a lien for these repairs by the common law, and this lien I hold may be enforced by the admiralty. When the disasters happened that rendered these repairs necessary, Fall, who was joint owner, assigned his share to a vendee, who at the argument was stated to be insolvent, and this statement was not denied. If the part owners are not personally liable, and the

ship is not, she will come to the vendee with all her reparations unpaid for by the new owners. This, I think, the maritime law will not allow. The master may apply the owners' part of her earnings in his hands. This is the freight of the ship, deducting expenses. For the ship is entitled only to her net freight after all expenses are paid. He may also retain the possession until repaid these expenses by her freight. But my opinion is, that he is not obliged to this slow mode of reimbursement, but may resort to the ship herself.

But it is objected that this is a libel against a part of a vessel, and it is said that there is no precedent in the books of a libel, in such circumstances as this case presents, against part of a vessel. But if a suit in such a case will lie against the entire vessel, I can see no grounds in principle, expediency, or convenience why it will not lie against a part. The reason for it is the same and the course of proceeding the same. A share or part of a vessel may be sold as well as the whole, and nothing is more common than for vessels to be held in shares. The want of a precedent may be a good reason to put us on a careful inquiry into the principles of the law, but cannot be a conclusive objection against the suit. It was observed by Lord Mansfield, nearly a century ago, that the law consists of principles and not of cases. And if this could justly be said in a court of common law, the remark will, with more reason, apply to the admiralty which administers the laws on enlarged principles of liberal equity. Its mode of proceeding, also, free from the artificial niceties of the common law, accommodate themselves to the substantial justice of the case. The jurisdiction of the court is indeed limited to a particular class of subjects, such as are of a maritime nature, but within the limits of that jurisdiction its movements are free, neither servilely subjected to the leading-strings of decided cases, nor restrained of its natural liberty by the shackles and chains of unyielding technicalities.

Another objection, not so easily overcome, is that the libel necessarily involves a settlement of accounts, and that the admiralty has no jurisdiction over matters of account. The libelant took the vessel on shares, a certain portion of the earnings of the vessel, deducting certain charges borne in common by the owners and employer, to be paid over to the owners, and the rest to be retained for his own use. If expenses were incurred in the course of her employment, which under the contract were chargeable on the owners, the proper fund for the payment of these charges, was that portion of the vessel's earnings remaining in his hands that belonged to the owners. Now if she was liable in specie for these charges by a libel in rem, she would only be liable for the balance after appropriating the funds in his

possession arising from her earnings, for it was his duty to appropriate these before resorting to the vessel. It is, therefore, plain that if a decree passes against the vessel, an account must be taken. It is admitted that the admiralty has no jurisdiction of matters of account as such, though they arise exclusively out of maritime transactions. The New Orleans v. Phebus, 11 Pet. [36 U. S.] 175; Minturn v. Maynard, 17 How. [58 U. S.] 477. But to hold the admiralty cannot look at an account which arises incidentally in a case over which it has jurisdiction, and determine the balance, is a very different question. Scarcely a suit is commenced by seamen for wages or by material men for labor or materials in building or repairing a vessel, which does not bring in an account in offset of payment made on account. It was never doubted that the admiralty might allow the offset, and give judgment only for the balance, without sending the owners to another court to recover back their advances.

When it is said that the admiralty has no jurisdiction over matters of account, the meaning I understand to be,—First, if the settlement of the account is the sole object of the suit, it is clear that the court has not jurisdiction, although it might have over each particular item. Secondly. When it is not the sole object, if it is apparent from the pleadings that this is one principal object, though not the sole one, and the accounts are long and intricate and multifarious, the court will decline to take jurisdiction. It will not, as observed by Lord Stowell, allow its jurisdiction to be used as a peg to hang a case upon which properly belongs to another forum. When the account arises incidentally it has been pointedly said, that the court holds itself bound to move within restricted limits. But it is very clear that the jurisdiction is not included by the simple fact of there being cross demands. In all cases where there are such incidentally arising in a case, it is a question addressed to the sound discretion of the court, whether it will take cognizance of the case or not, and to be determined by the general principles before stated. The present case demands no laborious examination of various and perplexed accounts. All the account to be taken is that of the earnings of the vessel for the benefit of the owners and the payments that have been made in the course of about one year. This, in my opinion, is quite insufficient to exclude the jurisdiction of the court. It is an account that may be adjusted just as well by a libel in this court or an action of assumpsit at law, as by the tedious and expensive process of a bill in equity, and with much less expense of time and money.

My opinion, on the whole, is that the court has jurisdiction, and that the pleadings set forth in the case entitle the libellant to relief.

This decree was reversed in the circuit court [Case No. 8,085] on the ground that a part owner has not a lien on the share of his tenant in common, for advances and disbursements.

NOTE. Another view may be taken of this case which may be thought entitled to some consideration, and which leads to the same conclusion. The prime cause of all these disasters, was the unseaworthiness of the vessel when she started on her voyage. Now, it is a principle of natural justice incorporated into all systems of jurisprudence, that every voluntary and responsible agent shall be held answerable for damages caused by his own fault. The correlative rule, deduced from the same principle of universal justice, is that no one shall be responsible for an injury not caused by his fault or that of some one for whose acts he is responsible. The Roman jurisconsults, who were as profoundly versed in the philosophy of morals and the abstract principles of justice as they were in the positive laws of their own country, carried out these principles to their last results. By the noxal action the owner was responsible for an injury caused by the unlawful action of his slave. But when the will of the master did not concur with that of the slave in his act, as was ordinarily the case, he might exempt himself from personal responsibility by abandoning to the injured party the slave, or noxa as he was called, with his peculium, the private property of the slave, which custom and the humanity of the Roman masters allowed their slaves to possess. This followed the slave as an accessory. Instit. Just. 4, 8, in principio. The same principle was applied to damages done by an animal. The owner could exempt himself from farther responsibility in abandoning the animal when no fault was imputable to him. Instit. Just. 4. 9, in principio; Dig. 39, 2, 7, 51. And following out still more vigorously the logical conclusion of the noxal action, the jurisconsults allowed an abandonment when the injury was caused by inanimate things, as a building. When the owner left it in a ruinous condition, so as to be dangerous to neighbors and others who might be exposed to it in falling, the owner was liable for the damage, but he could withdraw himself from personal liability by abandoning the materials. Rudera. Dig. 39, 2, 6; Dig. 39, 2. 7, § 2. With such curious logical consistency did the great Roman jurisconsults follow out this radical idea, that the responsibility for damage should rest only on that which was the cause of the damage, that the analogy of the noxal action was carried into the praetorian action damnum infectum. When a building was in a ruinous condition. and by its dilapidation dangerous to a neighbor. he might have a praetorian action to compel the owner to give security for future damages. Damnum infectum. If the owner refused, the praetor put the petitioner in possession either of the whole building or such part as threatened damage to him. Voet ad Pand. 39, 2. 10. And when this possession was confirmed by a second decree. he substantially became the proprietor. He did not indeed acquire the dominium civile but only the dominium praetorium. But the praetorian or equitable dominion was a possession under which the absolute or civil dominion could be gained by usucaption or prescription. And by one of these fictions and subtleties, which so abound in the Roman law, he was presumed. under a second decree, to have had the possession under a just title. that is the praetor's decree, for the time which was required to perfect his dominion by prescription, and, therefore. under the second decree it became its own absolutely. Dig. 39. 2. 15. 516: Voet ad Pand. 39. 2. 12.

Toullier. the most learned commentator on the French Civil Code. and one of the most profound jurisconsults of the last age, says that the noxal action was founded in justice. and he quotes with approbation the reason given for the limitation of responsibility in the institute. "Namque erat iniquum nequitiam eorum ultra ipsorum corpora dominis damnosam esse." Int. 4. 8, 2. We find something like the principle of the noxal action

in the original elements of the maritime law, in the limitation of the responsibility of owners to their interest in the ship, and her accessory the freight for any damage occasioned by the fault or insufficiency of the ship. The maritime law, from considerations of public policy, and in the interest of navigation and maritime commerce, extends the principle, and limits their responsibility, also, to cases of damage arising from the acts of the master or any of the ship's company, to the same measure. In all this, so far as it follows the principles of the noxal action, there seems to be at least a specious semblance of natural justice. If an owner lets his ship by a charter party, knowing her to be unseaworthy and unfit for the voyage, he may justly be held responsible for all the consequences on the ground of fraud. But these defects of vessels are often latent and unknown. It then seems neither to be unnatural nor unjust, that the employer should take some part of the risk. The just and natural consequence of such a limitation of a creditor's right and remedy to a particular part of the debtor's property, is to give him a lien and preference against that property, over all other creditors. This is done by the maritime law in the most direct and simple mode, by allowing him to proceed in rem, and to take the thing itself into custody for security. In the Roman law this lien on the thing, if in that law it may be so called, was enforced in a more indirect, circuitous and inconvenient way. There the party injured brought a personal action against the owner, according to the nature of the tort or delictum, and the owner might either pay the damages or abandon the slave. But though the noxal action followed the delinquent slave into the hands of a new master, if he had been transferred, yet there does not appear to be anything like a direct lien, amounting, as in the maritime law, to a tacit hypothecation. Inst. 4, 8, 6.

In this case, as the damage was caused by the fault or insufficiency of the ship without any absolute fault of the owner, by the principles of the noxal action, he might abandon the ship and freight for the damage, and, by the principles of the maritime law, these became hypothecated for an indemnity.