## THE CATHERINE M. MONAHAN.

(District Court, D. Maryland. June 29, 1912.)

MARITIME LIENS (§ 31*)—RIGHT TO LIEN—ADVANCES MADE BY PART OWNER.
    A partnership cannot assert a maritime lien for advances made against a vessel of which one of the partners is part owner.

    [Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 40; Dec. Dig. § 31.*]

In Admiralty. Suit by Louis Martin against the schooner Catherine M. Monahan. In the matter of the intervening petition of Fields S. Pendleton and another. Petition dismissed.

Arthur D. Foster, of Baltimore, Md., for libelant and intervening petitioner.

Edward E. Blodgett, of Boston, Mass., for respondent.

ROSE, District Judge. The issues before the court are raised by the intervening petition of Fields S. Pendleton and Edwin S. Pendleton, copartners trading as Pendleton Bros. The petitioners are shipbrokers. Their offices are in New York City. The "Catherine M. Monahan" was an American vessel. During a part of the time with which in this case we are concerned its home port was Providence, R. I.; during the rest of the time New London, Conn. From time to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

time the petitioners advanced moneys for the expense of the ship or for expenditures in some way connected with the ship. At no time at which any such advance was made was the ship in the state of Connecticut. Some of the advances were made when the ship was in ports south of Cape Hatteras upon drafts drawn by the master upon the petitioners; others were made to the master when in the port of New York. For these advances the petitioners' claim to have a lien upon the ship. With their petition of intervention they filed an itemized account. It aggregates $5,027.08. The larger part of this sum is for money advanced the master to pay persons who if they had not been paid would have had maritime liens for their bills upon the ship. An appreciable item in the account, however, is for commissions alleged to be due the petitioners for their services in from time to time negotiating charters for the vessel. The petitioners also charge the ship with the premiums paid by them on the insurance they caused to be effected on the amount of their advances. There are also some other items of relatively trifling amount for telegraph and long distance telephone charges. There is evidence in the record from which it may be inferred that some part, though probably not a large part, of the advances made to the master in New York or in Southern ports were applied by the latter to the payment of his own wages.

The ship's agent during this time was Mark O. Gilbert. Capt. Gilbert was at the same time president of the Gilbert Transportation Company. That company was during all the time with which we are concerned the owner of a larger share of the ship than was any other one person or corporation. During the latter part of the period it owned more than one-half of the ship. Its holdings at the time of the filing of the libel were $52/100$ of the whole.

It appears that none of the parties troubled themselves to keep always in mind the precise relation in legal theory which Capt. Gilbert and the Gilbert Transportation Company, respectively, bore to the ship. The weight of the evidence is that during all the time in which the advances were made Capt. Gilbert and not the company was the ship's husband or agent. A pregnant circumstance pointing to this conclusion is that it was Capt. Gilbert and not the company who distributed to the other owners of the Monahan their shares of its net earnings. There were a few exceptions to this rule. There were not many. There were peculiar circumstances in each of them. While the payments were made in this way, it appears that the ship's accounts were kept on the company's books, probably in part because the company had a bookkeeper and the captain had not.

The company's relation to the Monahan was simply that of the largest among many owners. To the extent that a ship's agent or husband could by any agreement with the intervening petitioners give them a lien upon the ship for advances made to the master for necessaries for the ship, Capt. Gilbert gave it.

There is no dispute that the interveners always thought that they had a lien. They were careful not to make any advances of appreciable amount, except under circumstances which they rightly or wrong-

ly supposed gave them a lien upon the ship. Capt. Gilbert knew that they thought they had a lien. He thought they had. He and they had frequent conversations about the ship and about the advances the interveners had made or might make for it. In these talks it was assumed by both parties that the ship was bound for the repayment of the money so advanced. When one man tells another, "I am making these advances on the credit of the ship, and the ship will be liable for them," and the owner of the ship, or the ship's agent, says, "I know you are, and of course the ship will be bound," the agreement that the lien shall be given is an express one. To hold otherwise would be to give form more weight than substance. The O. H. Vessels, 183 Fed. 561, 106 C. C. A. 107 (C. C. A., 3d Circuit).

How far the owners could, under the circumstances of this case, pledge the credit of the ship, and whether Capt. Gilbert as their agent was in these matters authorized to do for them whatever they might have done for themselves, and whether if he was not what the limits upon his authority were, are interesting questions which at present need not be discussed.

There was a necessity for the advances made to the master in southern ports. The credit of the owners of the ship in those ports was not such as would have enabled the needed supplies and advances to have been obtained upon it with the promptness which the necessities of the ship required. The same is probably true of the advances made in New York. It is, however, not necessary to give any careful examination to any of these matters, nor is there any occasion to discuss whether in any event for some of the items in the intervening petitioners' account a maritime lien could ever be created or exist.

These questions are interesting. They might under many circumstances be material. The decision of this case will not, however, turn on any of them. It will be controlled by a more fundamental issue.

One of the intervening petitioners, Fields S. Pendleton, is in his individual right the owner of $^{3}/_{100}$ of the ship. The claimant says that in consequence of that fact neither he nor the firm of which he is a member could acquire a maritime lien upon the ship. The interveners dispute this contention. They rely upon the decision of Judge Robert Hughes in Pettit v. The Charles Hemje, 5 Hughes, 359, 19 Fed. Cas. 395. In that case one of two co-owners of the ship was a machinist and boiler maker. He had furnished a boiler to the ship. The other co-owner had mortgaged his half interest in the vessel to secure some of his individual debts. The boiler maker libeled the ship for the value of the boiler. The mortgagee asserted its superior right over the half interest in the ship upon which it held a mortgage. The court held that the libel could be maintained, and that the libelant's claim must be satisfied in full before anything could be paid on the mortgage. The learned judge relied on two American and one English case. The Larch, 3 Ware, 28, 14 Fed. Cas. 1142; Foster v. The Pilot No. 2, 9 Fed. Cas. 569; The West Friesland, Swabey, 454.

It so happens that the two former had been reversed. Judge Hughes was aware of the reversal in The Larch. He, however, said the opinion of Judge Ware in the District Court was to his mind

more persuasive than that of Mr. Justice Curtis, who on circuit reviewed and reversed the decision below. The Larch, 2 Curtis, 427, 14 Fed. Cas. 1139.

In his view the subsequent criticism by Judge Lowell of the opinion of Mr. Justice Curtis had greatly weakened its authority. These criticisms were trenchant, but Judge Hughes overlooked the fact that they were directed principally, if not altogether, to some expressions in the opinion upon the doctrine of subrogation rather than to the point actually decided. As to that Judge Lowell not only applied it, but carried it farther than it had been necessary for Mr. Justice Curtis to go. The Jennie B. Gilkey (C. C.) 20 Fed. 161.

If Judge Hughes knew that Foster v. The Pilot No. 2 had been reversed, he did not allude to the fact. In that case two of several joint owners had served as mates on the ship. Money was due them for their wages as such. A judgment had been recovered against all the owners of the ship. The ship had been seized and sold under execution upon that judgment. After it had been delivered to the purchasers, they libeled it for their wages. District Judge Irwin upheld their right so to do. Mr. Justice Grier held this was error. The latter placed his decision on the obvious ground that the libelants could not assert rights superior to those of their own judgment creditors. Gallatin v. The Pilot, 2 Wall. Jr., 592, 9 Fed. Cas. 1100.

The last-cited case is an illustration of one of the many difficulties and complexities which would necessarily follow if the right of a co-owner to assert in admiralty a maritime lien against his ship is recognized. Its enforcement will almost always necessarily involve an accounting as between the co-owners.

The English case of The West Friesland, supra, was very nearly on all fours with the one at bar. There, as here, the libel was filed by a partnership. In that case, as in this, one of the partners was himself a co-owner of the ship. The objection to the jurisdiction of the court based on that circumstance was dismissed by Dr. Lushington with the remark that it was "only a technical objection. At common law partner cannot sue partner, but that is a rule that does not obtain in this court, and here the property is sued and not the co-partner."

Whatever may be said on behalf of this doctrine, it has not received the approval of American courts of admiralty—perhaps because they are rather keenly appreciative of how in almost every case it will involve an accounting between co-owners. That, a court of admiralty has ordinarily no jurisdiction to conduct. The West Friesland was decided in 1859. Eighteen years later, in the Eastern district of Michigan, Judge, afterwards Mr. Justice, Brown, with that learning and ability so characteristic of him, and never more strikingly displayed than in his admiralty decisions, discussed the question. The Benton, 3 Fed. Cas. 256. He reviewed the cases very fully, but apparently overlooked The West Friesland, supra, precisely as five years later Judge Hughes ignored The Benton.

In the last-mentioned cases Judge Brown held that a copartnership composed of three members could not assert a maritime lien against

a ship in which two of them were co-owners with four other persons. The later as well as the earlier cases are in harmony with his views. The Daniel Kaine (D. C. 1888) 35 Fed. 785; The H. E. Willard (D. C. 1891) 53 Fed. 599; The Lena Mowbray (D. C. 1895) 71 Fed. 720; Kellum v. Emerson (1854) 14 Fed. Cas. 263; Logan v. Aeolian (1859) 15 Fed. Cas. 786.

In the only cases which I have been able to find, in addition to those already mentioned, and which do not accord with Judge Brown's statement of the law, the facts were peculiar.

A ship had been sold under a decree of a court of admiralty. An owner of $^{10}/_{16}$ therein had filed an intervening petition. It appeared that he had for some time owned $^{1}/_{16}$. A few days before the filing of the libel under which the ship was sold, he had bought $^{9}/_{16}$ in it at public auction. At that time he was not aware that the mate of the ship had libeled it for wages. When he discovered the fact, he paid the wages and costs. Judge Lowell held him, as to $^{9}/_{10}$ of the sum so paid, entitled to be subrogated to the rights of the mate. The J. A. Brown, 2 Lowell, 464, 13 Fed. Cas. 186.

In this case it will be noted that the debt which he had paid was one to enforce the payment of which a libel had already been filed. When such is the fact, it is obviously to the advantage of all persons having any interest in the ship that the further accumulation of costs and expenses shall be stopped.

The M. M. Morrell was decided by District Judge Hanford in 1897. It is reported in (D. C.) 78 Fed. 509. There the master, who was a co-owner of the ship, sold his interest to two men whom he engaged to go with him as hunters on sealing voyage in the North Pacific. From one of them he received $350 cash and a promissory note of $350; from the other a promissory note for $700. To secure the payment of these notes he took a mortgage on the shares he sold them in the vessel. One-half their earnings on the voyage was to be applied to the payment of their indebtedness to him upon the notes. The voyage proved to be unprofitable. The master sold the sealskins secured and paid himself his wages and compensation in full. The hunters libeled the vessel for their wages which were not paid. The general rule that the owner cannot libel the ship was recognized; but it was held that, as there were no innocent creditors or purchasers to be prejudiced by a discovery of a secret lien, the rule would, under the peculiar circumstances of the case, be held inapplicable. The judge alluded to the cleverness of the master in persuading the libelants to purchase his interest in the vessel before hiring them. This case was carried on appeal to the Circuit Court of Appeals for the Ninth Circuit. Nelson v. White, 83 Fed. 215, 32 C. C. A. 166. It was there affirmed; the court expressly stating that:

"Our decision must, of course, be understood as being limited to the peculiar state of the case as presented by the record."

It is unnecessary, even if it were possible, to add anything to the discussion of this subject by Judge Brown.

The intervening petitioners contend that the only reason which prevents the assertion of a maritime lien by a co-owner is that admiralty

has not jurisdiction to entertain a libel for an accounting. That is unquestionably one of the reasons why the intervening petition in this case must be dismissed. It apparently is not the only reason.

The intervening petition asserts a lien upon the ship, or at all events a lien upon the interests of the other owners in the ship. In equity there is no difficulty about having an accounting; but even in equity a co-owner who is not a partner with the other co-owners has no lien upon their share of the common property for his advances. The Jennie B. Gilkey, supra; Macy v. De Wolf, 16 Fed. Cas. 353. The latter was decided by Mr. Justice Woodbury when on circuit.

None of the authorities, whether they are in favor of or against the contention of the intervening petitioners, suggest that there is any difference between the cases in which the advance is made by a co-owner individually and when it is made by a firm of which he is a member.

Much may be said on each side of the question upon which the decision of this case must turn. I regret to differ from so experienced an admiralty lawyer as the late Judge Hughes; but as against his view there are to be found decisions of no less than four Justices of the Supreme Court, viz., Justices Woodbury, Grier, Curtis, and Brown, as well as most of the cases in the District Courts.

The petition for intervention must be dismissed