WILLIAM C. BUSCH v. GEORGE A. WILCOX.

[See *post*, 336.]

*Principal and agent—Logging contract—False representations.*

1. An agent who is authorized to let a logging contract for his principal is authorized to do everything necessary to bring about such contract, and to make representations respecting the character of the lands, as being well situated for logging purposes; the character and quality of the pine, whether large or small, cork or sapling; and the quantity of timber on the land suitable for saw-logs.

2. The reiteration by an agent of representations made on behalf of his principal in order to induce a third party to enter into a contract will not relieve the principal from responsibility, even though such reiteration is coupled with a *personal* guaranty by the agent of their truth, and the added responsibility of the agent to stand between the contractor and harm.

3. When a person adopts the unauthorized acts of another in his behalf, and has received the benefits accruing therefrom, he adopts and ratifies the instrumentalities by which the fruits were obtained.

4. Where a jury are authorized to pass upon alleged false representations made to induce the execution of a contract, a request to charge based upon a portion of such representations as shown by the testimony is properly refused.

5. The doctrine is settled in this State that if there was in *fact* a misrepresentation, though made innocently, and its deceptive influence was effective, the consequences to the plaintiff being as serious as though it had proceeded from a vicious purpose, he would have a right of action for the damages caused thereby; citing *Holcomb v. Noble*, 69 Mich. 396 (head-note 3).

Error to Wayne. (Brevoort, J.) Argued April 17, 1890. Decided October 10, 1890.

Case. Defendant brings error. Affirmed. The facts are stated in the opinion.

*John D. Conely*, for appellant, contended:

1. One who deals with an agent is bound to inquire into the extent of his authority, ignorance of which is no excuse; citing *Hurley v. Watson*, 68 Mich. 531; *Hammond v. Bank*, Walk. Ch. 214; and only such contracts are enforcible as are within such authority, the agent alone being liable on collateral contracts; citing *Smith v. Tracy*, 36 N. Y. 79; *Baldwin v. Burrows*, 47 Id. 199.

2. The cases which hold that, if a principal ratifies and enjoys the benefit of part of a contract, he cannot repudiate the rest, refer to an *intentional* ratification, with knowledge of all that has been done; citing *Baldwin v. Burrows*, 47 N. Y. 199, 215, and cases cited; and this may be regarded as the settled law in Michigan; citing *McGraw v. Ins. Co.*, 54 Mich. 145, 149; *Hurley v. Watson*, 68 Id. 531, 538.

3. An action only lies against the principal when the plaintiff received the representations as the statements of the principal, and relied thereon; citing *Parker v. Armstrong*, 55 Mich. 176, 180.

*Marston, Cowles & Jerome*, for plaintiff, contended for the doctrine stated in the opinion.

CHAMPLIN, C. J. In October, 1882, one Remick held the legal title to certain lands in Mackinac county to the amount of about 2,000 acres, and one McKay claimed the

beneficial interest.    Remick had advanced the money to pay
for the lands, and held them subject to a purchase on
estimates by McKay within a given time.    The amount
advanced by Remick was about $4,000.    McKay attempted
to make sale of these lands to Buffalo parties, and through
a broker there applied to the firm of Noyes & Sawyer,
who were lumber dealers at Buffalo.    They telegraphed
George A. Wilcox, of Detroit, to investigate, and the
result was that Wilcox purchased the legal title of Remick,
jointly for himself and Noyes & Sawyer, with an agree-
ment with McKay that he should receive for his interest
one-third of the net profits arising from a disposition of
the land and timber thereon.    Remick had an estimate of
the pine timber on the lands made by Robinson & Flynn,
which showed that the land contained about 4,000,000
feet of pine.

George A. Wilcox had been quite an extensive dealer
in pine, as had also E. Hall.    These parties occupied the
same office in Detroit, and knew more or less of each
other's transactions.    After the above agreement was made
McKay called at the office of Mr. Wilcox for the avowed
purpose of borrowing money from him, upon the strength
of the interest he had in the deal as security.    Mr. Wil-
cox was absent, and McKay borrowed $1,000 from Hall,
and assigned his interest in the lands and profits to Hall,
as security.    Later he borrowed $500 more.    The money
was not paid by McKay, and Hall became the owner of
his interest in the contract on April 28, 1883.

Noyes & Sawyer desired to cut the pine in the winter of
1883–84, and convert it into lumber.    The other parties
interested were not anxious but willing it should be done.
In August, 1883, Sawyer, of the firm of Noyes & Sawyer,
came to Detroit, and had an interview with Hall about
letting the job of lumbering the tract during the coming
winter.    Wilcox was east, in Connecticut.    Sawyer went

as far north as Alpena, endeavoring to find some lumber-man who would take the job of lumbering the land. He did not succeed, and returned to Detroit. Hall, soon after making his purchase from McKay, sent his own estimator to examine the land, and report the quantity and quality of the pine it contained. His name was Van Riper. He made a report to Hall of the quantity and quality of pine on the tract, and his estimates exceeded 5,000,000 feet, by between one and two hundred thousand. This report Hall had, and also Robinson & Flynn's, in his possession when Sawyer returned to Detroit.

The plaintiff, William C. Busch, is a jobber in lumber-ing contracts, and was at the time possessed of a large outfit. He was at Harper's hospital, in Detroit, being treated for a diseased arm. He and Hall were old-time acquaintances, and were on friendly and intimate terms. Hall had visited him at the hospital, and knew that he had no contract for putting in logs the next winter. He recommended him to Sawyer as a competent and proper man to put in the logs from this tract of land, and he took Sawyer to see Busch at the hospital, where the mat-ter was talked over. Busch at first was disinclined to enter into a contract—

1. On account of his health.
2. Because he was not experienced in lumbering upon the north shore of Lake Huron, where these lands were, and knew nothing of the character of the land or the quality of the timber.

And he offered to rent them his outfit, but this they declined. The result of this interview was that Busch should telegraph for his foreman to come to Detroit, and another interview was had an evening or two later, at which Sawyer, Hall, Busch, and his foreman, Brumby, were present. At this time Hall produced a map of the territory and Van Riper's report or estimates, and also

the Robinson & Flynn estimates. The subject-matter of logging the tract was fully discussed. No one of the parties had ever been upon the land. Busch testified that they figured up the plats,—the estimates as shown. It was figured up on the plats, and it amounted to not very considerably over 6,000,000 feet. This by Van Riper's estimates. As to the other estimates, they were simply talked of,—that there was a big estimate, but did not suppose that the timber was there, estimated at some eight or ten millions. Mr. Busch further testifies that, upon that occasion, Mr. Hall said Mr. Van Riper had worked for him so long, and he had cut after his estimates, so that he knew thoroughly what there was, and he relied upon it, and guaranteed and warranted the timber; and, as to the quality, that there was somewhere in the neighborhood of one-half of it represented as cork pine, and the balance sap pine. Upon his cross-examination he testified that Hall stated that there was about 6,000,000 feet on the tract.

"*Q.* Did he say that, or did he say that the estimate showed that?

"*A.* That is the only thing that could show anything.

"*Q.* Did he say himself that there was 6,000,000 feet, or did he say that the estimate showed that; which did he say?

"*A.* Well, that I could not say. He referred to estimates that he made his figures on, of course.

"*Q.* Well, did he make figures in your presence?

"*A.* No sir; not at that time.

"*Q.* What do you mean by his making figures?

"*A.* Well, he makes his figures,—I mean, of course, he figures 6,000,000 feet from estimates in his possession."

On the subject of cork pine, on cross-examination, he testified:

"*Q.* Now, tell us what was said by Mr. Hall at that time about cork pine.

"*A.* They figured up there was so much pine upon it, and there was so much cork pine."

Arrangement was made at that interview by which Busch agreed to put the timber in, and Mr. Hall was to prepare a contract in accordance with such arrangement. It appears also from the testimony that, sometime during these interviews, Mr. Busch was informed of the respective interests of the parties in the land and proceeds. Mr. Hall did prepare a contract, which he left with Mr. Busch at Harper's hospital, and which contract was as follows:

" William C. Busch and George A. Wilcox agree as follows:

" Busch agrees and undertakes to cut into saw-logs, haul, and put afloat in the waters of Lake Huron, in the bay or bays contiguous to the lands from which said logs are hauled, all the pine timber suitable for sawing into lumber standing or lying on the lands described in the schedule appended hereto; the work to be done in a skillful and workman-like manner, cutting out roots and shakes so as to make good logs, and at the same time, as far as possible, economize timber; the work to be commenced as early as practicable this fall, and to be completed during the next winter and spring, so as to permit sawing during the summer of 1884: *Provided,* however, if the weather or other insurmountable obstacles prevent a full completion of the job within the time specified, another year shall be allowed during which to complete the same; the timber to be butted and cut into lengths from 12 to 24 feet, as said Wilcox or his agent may direct.

" For the above work, Wilcox agrees to pay Busch four dollars and twenty-five cents ($4.25) per thousand feet, board measure, according to rule and custom of scaling in Saginaw waters; the logs to be scaled by a competent scaler, to be agreed on by the parties, whose wages or compensation shall be paid one-half by each party to this contract.

" Payments shall be made as follows: Five thousand dollars ($5,000) upon the signing of this contract, or as soon thereafter as Busch shall require the same for the purchase of supplies, etc., for the purpose of fulfilling this contract, and for transportation of same with stock, implements, laborers, etc., to the land to be operated;

five thousand dollars ($5,000) during the winter and spring of 1883–1884, as same may be needed from time to time by Busch, for use in this operation; and the balance in full upon the completion of the contract.

"Also agreed that ash, birch, bass-wood, and elm timber may be lumbered same as pine, at the option of said Wilcox.

"GEO. A. WILCOX,

"By E. Hall.

"WILLIAM C. BUSCH.

"*Detroit*, Sept. 22, 1883."

"Schedule of lands attached to a memorandum of contract between William C. Busch and George A. Wilcox, said lands being the tracts to be operated under said contract:

| SUBDIVISION. | SEC. | TOWN. | RANGE. | ACRES. |
| --- | --- | --- | --- | --- |
| South half of | 3 | 42 N. | 1 E. | 320 |
| Whole of | 10 | " | " | 640 |
| West half of | 11 | " | " | 320 |
| S. ¼ of N. E. ¼ | 20 | " | " | 80 |
| S. ½ of N. W. ¼ of | 21 | " | " | 80 |
| West half of | 26 | " | " | 320 |
| S. ¼ of S. E. ¼ of | 26 | " | " | 80 |
| N. ½ of N. W. ¼ of | 35 | " | " | 80 |
| N. ¼ of N. E. ¼ of | 35 | " | " | 80 |
| S. E. ¼ of N. F. ¼ of | 35 | " | " | 40 |
| S. W. ¼ of N. W. ¼ of | 36 | " | " | 40 |
| E. ½ of N. W. ¼ of | 36 | " | " | 80 |
| S. W. ¼ of N. E. ¼ of | 36 | " | " | 40 |

"GEO. A. WILCOX,

"Per E. Hall."

This contract, when presented to Mr. Busch for his signature, was dated Detroit, September 22, 1883, and was signed "Geo. A. Wilcox, by E. Hall." After the contract had been in Busch's possession a few days, he met Mr. Hall as he was going out of the gate of the hospital yard, and the matter of signing the contract by Busch was spoken of. Busch testifies that he handed Hall the contract, and told him, after reading it through, that he had some question about the contract; that he would not sign, and could not sign, it, in justice to himself; that some things were talked over between them, and there

82 MICH.—21.

were some things that were not in the contract, and he could not live up to it; the matter of payments was not sufficient to carry his work, as he had explained to him, and, the next thing, the guaranty of estimates was not in the contract at all; the character of the land was not in the contract; and that, unless there was something to protect himself, it would ruin him if it was not as they had talked and agreed before. Hall said that Wilcox was far away. Sawyer had gone home, and Busch must do that work. Said he had been a friend to him of long standing; that he would see that these things were all right; he must go and do the work. Busch objected to it for some time, and Hall used a good deal of persuasion; finally got him to sign the contract to go on and do the work. He told Hall it did not contain all they had talked, and all as it was understood; that the payments would not cover the work, and that they had talked over before the contract the amount of timber and the character of the timber; that the character of the land was not anywhere mentioned as they had talked; that, if it was not as they had talked, it would certainly ruin him. Hall said:

"It was there, and we could rely upon it,—could guarantee the timber was there; the quantity and quality was there; he could guarantee Van Riper's estimates any time, and stand by the estimates at any time.

"Q. And then it was upon the strength of that representation you consented to signing the contract?

"A. Yes, sir; he persuaded me. I gave other reasons for defects in the contract. *    *    *    *    *    *

"Q. And it was upon his statement to you at that time that you affixed your signature to this contract?

"A. Yes, sir.

"Q. And you would not have done it except for that statement?

"A. Except this statement.

"Q. His statement, if I understand you right, was

this: That Mr. Wilcox was away from home, and he [Hall] would guarantee the accuracy of the estimates.

"*A*. Yes, sir, certainly; he would stand by his estimates, certainly.

"*Q*. And that is the reason you did not insist upon having it inserted in the contract?

"*A*. He explained to me that he could not do it, for the reason that Mr. Sawyer had gone home, and Mr. Wilcox was out of his reach, and this work had to go on at once, and he would not; that I must go and sign the contract, and go on and do the work, and he would stand between me and all harm. * * * * * *

"*Q*. And then you went into the house and affixed your signature and he went away?

"*A*. I could not say that I affixed my signature there at that time, but that day. I at once telegraphed up for Mr. Brumby to go on and fit out and go ahead.

"*Q*. At any rate, as soon as Mr. Hall told you what he would do, you made up your mind to go on with the contract?

"*A*. Yes, sir."

This contract provides that a scaler should be chosen to scale the logs, but none was in fact chosen; Mr. Hall and Mr. Busch afterwards modifying the contract so that the amount should be arrived at from a scale of the logs in the mill where they were sawed into lumber, and this amount showed 3,300,000 feet, as the total amount put in by Mr. Busch. It appears from the testimony that Mr. Busch did not fully complete his job; that, on account of a storm and the breaking up of a cedar swamp, he was unable to put in all the pine which stood on section 10; that there was 295,000 feet left on that section. He also failed to put in a portion of the timber on section 21, amounting to 80,000 feet, making a total, of timber not put in, of 375,000 feet. He stopped working upon the job some time in February or March, 1884. In the execution of the work he was obliged to build camps on two different portions of the tract, and to make roads from the place where the logs were to be banked to the

skid-ways, and also to get his supplies in camp for his men and teams. He claims that there was a shortage in the quantity of timber ·of nearly half, and that, instead of there being one-half cork pine, there was no cork pine upon the tract; that had there been cork pine it could have been lumbered at very much less expense; and also that the expense of building his roads was as great, to remove the quantity he did, as it would have been to remove 6,000,000 feet, had it been there, as he claimed it was represented to be, and that by the expenditure of $2,000 more than he did expend he would have been able to put in 6,000,000 feet.

He has brought this action in a plea of trespass upon the case against George A. Wilcox, to recover damages for what he claims were misrepresentations, which induced him to enter into the contract.    There is but one count in the declaration, and the representations set out in that count are as follows:

"The defendant, well knowing the premises, to wit, at the city of Detroit, in said county, on, to wit, the 20th day of September, 1883, falsely and deceitfully represented to the said plaintiff that he, said defendant, was possessed of certain lands hereinafter described, situate in the county of Chippewa, in said State, upon which there was a large quantity, to wit, six million feet, of pine timber, a large proportion of which, to wit, one half, was cork pine, and the balance sap pine, the said defendant then well knowing that it was more expensive, and cost, to wit, one dollar a thousand, more to lumber sap pine than cork pine."

After setting forth the contract entered into, the plaintiff avers that—

"The · said plaintiff afterwards, relying upon the statements made by said defendant, and believing such representations to .be true, and in the performance of his said contract, to wit, on the 1st day of October, 1883, incurred large obligations, and employed a large force of men, to wit, three hundred

men, for a long space of time, to wit, for six months, and sent the said men, with a large force of teams, sleighs, supplies, and other things necessary to enable him to cut into saw-logs, haul, and put afloat from off said lands, at the time and in the manner mentioned in said contract, seven million feet of pine; and, in further performance thereof, erected camps, cut, opened, and constructed roads through said lands, and made all the necessary and other arrangements to cut, haul, and put afloat said seven million feet; whereas, in truth and in fact, there was not seven million feet of pine timber upon said lands, as the said defendant, at the time of making the said false and deceitful representations, well knew; that, on the contrary, there was but, to wit, 3,500,000 feet of pine timber upon said lands; and whereas, in truth and in fact, one-half of the same was not cork pine, and the same was all sap pine,—all of which was well known to the said defendant at the time he made said false and deceitful representations.

"By means of which said several premises the said plaintiff was then and there put to great and unnecessary costs and expense, and then and there lost and was deprived of the profits, benefit, and advantage which he otherwise would have derived and acquired from the performance of the said contract, to wit, to his damage," etc.

The defendant pleaded the general issue. The cause was tried in the Wayne circuit court before a jury, and resulted in a verdict and judgment for plaintiff, and the defendant brings the case here on writ of error. Thirty-one errors are assigned, but only a portion of them are relied upon in the brief,—being 11, 12, 19, 27, 20, 28, 21, 22, 23, and 24.

The eleventh error assigned is to the refusal of the court to instruct the jury to render a verdict for the defendant. In support of this request it is claimed that there is no testimony which tends to prove that Hall was the agent of Wilcox in the making of the contract; that it was incumbent upon the plaintiff in this action, not only to show the agency, but the scope and extent of the

authority conferred; that, not having done this, there is no basis for a recovery against Wilcox for misrepresentations made by Hall. This question lies at the threshold of the plaintiff's right to recover, and must be first determined. The testimony is all returned, and from it we must ascertain if there is any from which a jury might infer that Hall was, at the time these negotiations were carried on, the agent of Wilcox in making the contract.

It appears that the parties interested in the legal and equitable ownership of this land desired to let the job of cutting and putting in the logs. They were acting in concert, not each one for his separate and individual interest, but as a whole. Indeed, their interests were such that harmonious action of all was the only action which could produce the best results; and it appears, beyond doubt, that each was acting for the best interests of all. Noyes & Sawyer wanted to put the logs in the next winter. Wilcox and Hall were willing it should be done. Hall had obtained his estimate. Sawyer came on with a view of letting the job. The legal title was in Wilcox, and very properly, if not necessarily, the contract would be made in his name. The object of the interviews with Busch was to induce him to enter into the contract for putting in the logs, in which all were interested, and all were willing it should be done. The contract was signed by Hall, as agent of Wilcox. It was declared upon as the contract of Wilcox, and its execution was not denied by the pleadings. It was acted upon by Wilcox as his contract, and no denial has ever been made that it was his contract. He has brought suit against Busch for not performing it. These facts are sufficient to warrant a jury in finding that an agency existed, and that Hall was clothed with sufficient authority to accomplish the object desired by all. This object

was to enter into a contract with some person to cut and put in the pine upon the lands of which Wilcox was the legal owner, and in which the others were beneficially interested. The contract was considered complete and operative from the time it was signed. There was no understanding that it was not to be of any force or effect unless or until ratified by Wilcox. On the contrary, it was urged that the work must commence at once, and there was not time to draw up a new contract and incorporate in it what Busch claimed should have been embraced in the one he signed. The authority to execute the contract as written by Hall, acting as Wilcox's agent, is not disputed. The objection is that, as the representations complained of were not included in it, if any such were made, they were beyond the scope of the authority of Hall to make, and are not binding upon Wilcox. Whether or not they were within the scope of the agent's authority to make depends upon what the agent was authorized to do. If Hall was authorized to make a contract on behalf of Wilcox to have the pine timber cut into saw-logs upon the tract of land specified, and banked, or put afloat, then he was authorized to do everything necessary to bring about such contract, and to make representations respecting the character of the land, as being well situated for logging purposes; the quality of the pine, whether large or small, cork or sapling; and the quantity of pine suitable for saw-logs upon the land. All these facts appertained to the subject-matter, and were necessarily involved in making any contract for lumbering. All of these considerations are inducing causes for the logger to enter into a contract, and are essential in determining the price for which the logger will perform the work. This is evident to any one having a knowledge of such transactions; but the testi-

mony in this case shows that no contract could be made without giving weight to such facts.

Now, it appears without contradiction that neither Busch nor his foreman, Brumby, had any knowledge or information respecting this tract of land. Neither Sawyer nor Hall had ever seen the tract. Who, then, supplied this information upon which Busch must necessarily act, in order to determine the price per thousand at which he would lumber the tract? The testimony is convincing that Mr. Hall produced and furnished all the information Busch had respecting the essential elements which went to make up the expense of putting in the logs. He produced the maps showing the location of the land, from which the length of haul could be estimated; showing, also, the quantity in each locality. He produced also the book containing the report of Van Riper showing the quantity and class of pine, as to being cork or sapling. Whatever Hall said as to the quantity and quality of the pine was as much within the scope of his agency as it was to enter into the contract at all as Wilcox's agent. It requires no argument to prove that both quality and quantity were material matters, and any representations as to them must necessarily have been relied on by Busch.

It is not contended by counsel for defendant that if an actual agent makes false representations, whereby another is induced to make a contract into which he would not have entered except for the representations, the principal would not be liable. On the contrary, he admits that a principal is liable to respond for the frauds of his agent done in the course of his employment, whereby another is involved to his injury, and even for his frauds and other torts, when committed in doing what he was intrusted to do. And counsel does not controvert the authorities which hold that a principal, by adopting a

contract made for him by an actual agent, and receiving and retaining the profits as belonging to him by virtue of that contract, assumes responsibilities for the *instrumentalities* which the agent may have employed in his behalf to effect the contract; but he insists that such authorities hold that the ratification must be intentional and with a knowledge of all that has been done, and that this responsibility for *instrumentalities*, either in the case of an actual agent or of one whose contracts have been ratified by adoption, does not extend to. collateral contracts made by the agent, not known to the principal, though such collateral contract may have been the means by which the agent was enabled to effect the authorized or adopted contract, and though the principal retain the proceeds thereof after knowledge of the fact.

The counsel for defendant also contends that, in all cases in which a person is held liable because of the representations of an agent, the person injured must have relied upon the representations as coming from the principal himself, and must have considered that the agent making the representations was speaking for and in behalf of his principal; and if the testimony discloses that the person to whom the representations were made received them as the representations of the agent, and not those of the principal, then the principal cannot be liable, but the agent only; and, in an action on the case, it is not only necessary that the plaintiff should have relied on the representations, but the action can be brought against the principal only when the person to whom the representations were made received them as the statements of the principal.   And, applying the principles above advanced to this case, he calls attention to the testimony of the plaintiff, in which he positively asserts that it was upon the statement of Mr. Hall that the timber was there, both as to quantity and quality, and

that he could guarantee Van Riper's estimates, and stand by the estimates at any time,—that it was upon the strength of those representations that he consented to sign the contract.

The only new element this introduced was Hall's personal guaranty of the correctness of the estimates, and his assurance to Busch that he would stand by them. The representations were no other or different than had been made before, and a reiteration of them would not relieve the principal from responsibility, even though coupled with the guaranty by the agent of their truth, and the added responsibility of the agent to stand between the contractor and all harm. It is not strictly accurate to say that the party must rely upon the representations as those of the principal, and not as those of the agent. It is more accurate to say that the representations of the agent made respecting transactions within the scope of his employment, which were relied upon, and induced the party to enter into the contract, will be imputed to the principal as his representations, and for the accuracy of which he must answer."

" While keeping within the scope of his authority, and engaged in its execution, he is the principal, and his statements, representations, and admissions in reference to his act are as much the principal's as the act itself. Such statements, representations, and admissions are therefore admissible in evidence against the principal in the same manner as if made by the principal himself." Mechem, Ag. § 714, and note.

That Hall had the authority to make the contract for Wilcox is not, and cannot under the testimony be, gainsaid. All authority conferred upon an agent rests upon the will and intention of the principal. That intention is proved, not only by words, but by conduct. And the conduct of Wilcox, and the situation of the parties, and their relation to the subject-matter, afford convincing

proof of the authority of Mr. Hall to act as Wilcox's agent in making the contract with Busch.

It is urged by counsel for defendant that this contract was made without previous authority, and became binding simply by adoption after it was sent to Mr. Wilcox, and hence no representations are binding upon him which he had not been apprised of at the time of or previous to his adoption of the contract. This contention is based upon Mr. Hall's testimony to the effect that he supposed that Mr. Sawyer would execute the contract for Mr. Wilcox until the time came to execute it; and then he and Sawyer had a discussion, not in Busch's presence, and he says that he told Sawyer that he had no legal authority to sign it for Wilcox; that (I quote his testimony)—

"It was then represented" (by whom is not stated) "that I was there for years, and I, when Mr. Wilcox was away, attended to and looked after his interest and his business. Mr. Sawyer had a partner, and he and his partner were only representing a partner's interest against Mr. Wilcox's; and he seemed to think, on the whole, I ought to take the responsibility of signing the contract for Wilcox," and, "after talking it over with Mr. Sawyer, I accepted his view of it. But, on the whole, I thought it was possible for me to sign it for Mr. Wilcox, and send it to him for his recognition."

The understanding and talk between Hall and Sawyer in Busch's absence was irrelevant; it cannot affect Busch; the material point being, from all that occurred in his presence, what was said and what was done, and the interest of the parties in the subject-matter, was he at the time authorized to enter into the contract by Wilcox; or, if not, did his acts and representations become binding upon Wilcox by his subsequent adoption of the contract made by Hall in his behalf?

If, however, it be conceded that there was an entire want of authority from Wilcox to Hall to execute the contract at the time it was executed by Hall in his name,

there can be no question that it became Wilcox's contract by adoption. He adopted the contract as his own, received the logs which were cut, hauled, and put in by Busch, made advances to him under it, and claims rights under it in the suit he has instituted against Busch for not performing it. He has received the benefit of the contract so made by Hall in his name, and the controversy has not been as to the authority of Hall, as agent, to make the contract, but as to the means or instrumentalities employed by Hall in inducing Busch to enter into it. When a person adopts the unauthorized acts of another made in his behalf, and has received the benefits accruing therefrom, he is held to adopt and ratify the instrumentalities by which the fruits were obtained. He cannot receive the benefits, and escape liability for the frauds or misrepresentations which have placed the fruits in his hands. This is not only elementary law, but is so well founded in the domain of morals as not to need the citation of authorities. The plaintiff, therefore, had a right to have the question whether any misrepresentations were made by Hall, as claimed, submitted to the jury, and the eleventh assignment of error must be overruled.

The twelfth assignment of error is based upon the refusal of the court to charge that,—

" It is not sufficient to entitle the plaintiff to recover that Mr. Hall produced the estimates, and stated that he had high confidence in Van Riper as an estimator, or that he, Van Riper, was a reliable man."

The jury were entitled to pass upon all the representations made by Hall as to the quantity of the pine timber upon the tract, and also with reference to what Hall said concerning Van Riper and his estimates. The request does not contain all that the testimony shows was said by Hall upon the subject, and was properly refused.

The court gave the third request of plaintiff's counsel, as follows:

" In order to make out deception in this class of cases, it is not essential that false assertions should be made in express words, but one may accomplish a fraud by encouraging and taking advantage of a delusion known to exist in the minds of others, especially where assertions or statements are made calculated to create such a delusion."

This charge is the subject of the nineteenth and twenty-seventh assignments of error. Counsel for defendant insists that this instruction was entirely improper, under the declaration in this case, and under the testimony. The declaration has been quoted in the former part of this opinion. It does not set forth the language nor the method in which the representations were made. The declaration is broad enough, and specific enough, to permit proof of whatever representations were made, and of the manner in which they were made, whether by express words, or by reference to papers or writings, or by the use of terms which convey to the mind certain qualities or conditions of the subject-matter of the agreement. The law laid down in the instruction is unobjectionable, and we think there was testimony which justified the court in the statement of the law.

We discover no error in the twentieth and twenty-eighth errors assigned. The twentieth is covered by what has been said. The twenty-eighth reads as follows:

"In saying to the jury that if, at the time of the interviews preceding the execution of the contract of September 22, Mr. Hall knew or had reason to believe that the plaintiff knew or relied upon him (Hall) for such information necessary to enable him (Busch) to enter into the agreement, then it was the duty of Mr. Hall, when he undertook to impart such information, to give it fully and accurately; and, in saying that if, under such circumstances, Mr. Hall had an estimate in his possession of

the quality and quantity of the timber upon this land by Van Riper, and knew that Mr. Busch, on account of sickness, was unable to and did not examine the same, and Mr. Hall undertook to state to Mr. Busch the quantity and quality of logs shown thereby, then it became his duty to state the same fully and accurately."

Only four other assignments of error are noticed or argued in the brief of counsel for defendant. These are the 21st, 22d, 23d, and 24th, and relate to the following instructions given by the court:

"5. If, at the time Mr. Hall met Mr. Busch at Harper Hospital, he (Hall) had two different estimates of the land in question, one showing a much smaller quantity and in quality inferior to Van Riper's estimate, and he (Hall) knowing that Mr. Busch was relying upon him for information as to quantity and quality in order to enter into the agreement of September 22, and you further find that Mr. Hall undertook to impart to Mr. Busch such information, then it was Mr. Hall's duty to inform Mr. Busch as to the quantity and quality shown by each estimate, and if you find that he did not exhibit to Mr. Busch the smaller estimate, in order to induce Mr. Busch to enter into the agreement of September 22, in reliance upon the accuracy of Van Riper's estimate, and you further find that the Van Riper estimate was grossly inaccurate, both as to quantity and quality, and that the other estimate was substantially correct, these would constitute such a fraud as would enable the plaintiff to recover.

"6. When an agent makes material representations to a jobber as an inducement for the latter to enter into an agreement, and which is entered into in reliance thereon, and the person making such representations claims and so states to the jobber that he makes such representations in good faith, and upon an estimate which he believes to be reliable, and such agent then has another estimate which he believes, if communicated to the jobber, would prevent the execution of such a contract, and for this reason does not communicate to him, in so withholding such estimate he is committing a fraud for which his principal will be liable."

"8. The plaintiff claims that Mr. Hall represented that there was a little under or a little over 6,000,000

feet of timber upon the land, and that about half was cork pine. Mr. Hall, in his testimony, says that he represented the estimates to show by the plat and the book that the quantity was 5,162,000, and that a portion of it was cork pine. The plaintiff claims that there was cut about 3,300,000, and that about 350,000 feet left uncut, and but little, if any, of the timber was cork pine. It is for you to find from all the evidence in this case what are the true facts, both as to the representations made, and the quantity cut, and left uncut, and what proportion, if any, was cork pine; and, should you find that the entire quantity of timber cut and uncut was as testified to by Mr. Busch, he would be entitled to recover all that falls far short of the quantity 5,162,000 feet, which Mr. Hall admits he represented to be on the land, according to Van Riper's estimate, provided you find that Busch, in entering into the agreement of September 22, relied upon the representations so made by Mr. Hall as to the quantity and quality of the timber upon the land."

These instructions appear to us to have been warranted by the testimony, as was also the seventh instruction, which constitutes the twenty-third assignment of error. In this the court said:

"If you find that Mr. Hall, acting as agent for Wilcox, knew that Busch did not know the quantity of the timber upon the land in question,—there is no question about that,—if you find that Mr. Hall, as agent for Wilcox, knew that Busch did not know the quantity of the timber upon the land in question,—that is, if he did not know from anything except from what he had heard, because the evidence shows that none of these men had ever been upon the land, and what they depended upon was Van Riper's figures, and the books and the map, and that there was also another estimate there got up by Robinson and Flynn,—and expected that Mr. Busch would, in entering upon the agreement, rely upon such information as he (Hall) might give him, and you further find that Hall did, in good faith, make material representations as to quality and quantity of timber to be lumbered, and at the same time he made such representations stated that he made them upon Mr. Van Riper's estimates, which he believed to be correct, and that Mr. Busch, relying upon such representations, did enter into

the agreement of September 22, and you further find that there was not upon the land the timber, either in quantity or quality, as represented, the plaintiff would be entitled to recover. The law of this State considers the deceptive influence of such misrepresentations, though made innocently, as effective in inducing the contract, and the consequences to Busch as serious, as though the same had proceeded from a vicious motive; the result in either case would be, in contemplation of law, a fraud upon Mr. Busch, and would entitle him to recover such damages as he has sustained thereof,—that is, if Mr. Hall said or did anything that was untrue. Now, what did Mr. Hall say, or what did Mr. Hall do, that was untrue? I leave this to you."

The seventh and eighth instructions are in harmony with the decisions of this Court, and state the law applicable to the case upon trial. *Holcomb v. Noble,* 69 Mich. 396 (37 N. W. Rep. 497), and cases cited in the opinion of Mr. Justice MORSE.

The errors assigned are overruled, and the judgment of the court below is affirmed.

The other Justices concurred.