CALLIHAN *v.* TALKOWSKI.

1. FRAUD—INDUCEMENT—MISREPRESENTATION OF GROSS SALES OF TAVERN BUSINESS.

Trial court committed error in holding that a previous representation of past gross sales figure in tavern business could not be considered as an element of inducement, where parties had entered into a written contract which omitted mention thereof and at the discussion and signing of which no mention of such gross sales figure was made, the proper test being whether or not the advertised figure exerted a material influence upon the minds of the plaintiff purchasers and was 1 of several motives which produced the resulting sale for which the purchasers sought damages by reason of alleged misrepresentation.

2. COSTS—NEW TRIAL.

Costs of trial and appeal are directed to abide final result of new trial, where action for fraud is reversed for retrial.

CARR, C. J., and DETHMERS and KELLY, JJ., dissenting.

Appeal from Mackinac; Fenlon (Edward H.), J. Submitted May 7, 1963. (Calendar No. 41, Docket No. 49,429.) Decided December 2, 1963.

Case by Gerald D. Callihan and Helen L. Callihan against John W. Talkowski for damages sustained by reason of fraud and misrepresentation in sale of resort restaurant and bar. Judgment for defendant.

* Continued from Volume 371 Michigan.

REFERENCES FOR POINTS IN HEADNOTES
[1] 24 Am Jur, Fraud and Deceit § 204.
[2] 5 Am Jur 2d, Appeal and Error § 1012.

(1)

Plaintiffs appeal. Reversed and remanded for new trial.

*Herbert, Wood & Hood* (*George G. Wood,* of counsel), for plaintiffs.

*Brown & Brown* (*James J. Brown,* of counsel), for defendant.

Kavanagh, J. Plaintiffs appeal from a judgment of no cause for action entered by the circuit court for the county of Mackinac in a law action for fraud. Plaintiffs in their declaration for damages alleged fraud predicated on defendant's misrepresentation of gross sales of a bar and food business known as Cut River Inn. They further alleged they had read 2 advertisements in the Detroit News offering the place for sale, the first of which read in material part as follows: "Gross sales $29,000 in 8 months." The second advertisement read in material part as follows: "Gross sales $29,000 for 8 months."

Plaintiffs contend they relied on these representations and in pursuance thereof purchased the business for the price of $29,300 plus that portion of the merchandise inventory in excess of $800. They discovered, after a period of operation, that their gross income from the business was going to be substantially below the $29,000 gross sales for 8 months. They sought in their declaration $20,000 damages for the fraudulent misrepresentations.

Defendant answered denying the allegations and alleging that the plaintiffs were informed the Cut River Inn was for sale and visited the premises before the newspaper advertisements appeared and, therefore, could not have relied upon the advertisements. He further alleged that the $29,000 gross was discussed prior to the plaintiffs' acceptance of defendant's proposal of sale and it was clearly ex-

plained and pointed out to plaintiffs that defendant had not had a full season's business experience; that the $29,000 gross was the figure told to defendant to be the previous owner's (Fisher's) gross sales for the year 1954; that plaintiffs understood defendant did not have personal knowledge of the gross for any 1 year's operation. The answer further alleged that it was explained to plaintiffs that the combined gross sales of the Fishers and Talkowskis were not equal to $29,000 during 1955 because business had been down that year due to the steel strike.

As an affirmative defense, the defendant alleged in his answer that he had been defrauded by the misrepresentation of the value of plaintiffs' equity in a certain land contract, which equity had been transferred to defendant by plaintiffs as a $7,100 credit on the purchase price of the Cut River Inn.

In reply, plaintiffs denied that defendant at any time, in any manner, qualified, deviated or detracted from the representation to them that the business had $29,000 gross sales for the 8-month operating season. They denied any fraud with reference to the equity in their land contract. Both parties admit the falsity of the representation as to the $29,000 gross sales.

The case was tried below on behalf of defendant on the theory of *Krause* v. *Cook,* 144 Mich 365:

"If a person receives information from others, and believes it, and repeats it, explaining that he has no personal knowledge, he is not guilty of fraud." (Syllabus 3.)

The matter is argued here on the same theory and reliance is had upon the same case. *Krause* v. *Cook* is not applicable to the facts in the instant case. Even if we found defendant Talkowski actually told plaintiffs the gross sales figure of $29,000 was not his figure but that of the previous owner, if it was

in fact false, he would not be absolved from liability unless there was an absence of reliance.

In *Aldrich* v. *Scribner,* 154 Mich 23, 27 (18 LRA NS 379), Justice Carpenter, writing for a majority of the Court, distinguished the holdings in *Holcomb* v. *Noble,* 69 Mich 396, and *Busch* v. *Wilcox,* 82 Mich 315, from *Krause* v. *Cook, supra,* stating:

"In the *Holcomb* and *Busch Cases* the defendant himself obtained what plaintiff lost by means of the false representations. In the *Krause Case* the defendant was an agent, who at most received only 10% of the damages caused by the false representations. This difference, in my judgment, places the *Krause Case* outside the rule of the *Holcomb* and *Busch Cases.* That rule is peculiarly a Michigan rule."

Justice Carpenter then went on to say (p 28):

"In Michigan we have held (see cases cited in the opinion of Justice Morse in the *Holcomb Case, supra*) that, in order to constitute a fraud, it is not necessary that the person making the statement should either know that it is untrue or be recklessly and consciously ignorant whether it be true or not. It is sufficient if it be false in fact. It must be said, however, that in the cases in which this principle has been applied, the defendant obtained what the false representations caused the plaintiff to lose. Applied in such cases, the principle is a just and salutary one."

The rule of the *Holcomb Case* has been recently followed by Justice Black in *Kroninger* v. *Anast,* 367 Mich 478, and by Justice Souris in *Irwin* v. *Carlton,* 369 Mich 92, 95.

The trial court supported its finding of no reliance by plaintiffs on the newspaper advertisements as follows:

"The facts show conclusively that the carefully prepared written agreements included the full understanding of the parties with definite knowledge that they were purchasing at fixed prices certain enumerated types of personal property which were involved in this sale. The consideration very fully explained in the agreements, was based upon a fixed price for 3 definite groups of personal property. No actionable fraud could arise out of such a complete, fully explained transaction embodied in a written instrument. No confidential relationship or other influence existed on the record. The parties were strangers and dealt at arms length with the common attorney who pointed out in the agreement exactly what was offered and what was purchased.

"The discussion in Mr. McNamara's office which resulted in the execution of the preliminary agreements, show that the statement in the advertisements did not enter into the transaction as a motivating cause and inducement of this sale. The reason for this statement above is that the agreements themselves show that a definite price was fixed as the consideration by the parties, and that Mr. McNamara, representing both parties in drafting the agreement, after full discussion with them, divided the consideration into 3 separate parts. This language in the agreement is quoted as follows:

" 'The consideration paid on this agreement is as follows: For personal property other than stock and merchandise $18,500; for license, interest in lease, trade and bar fixtures and good will $10,000; for stock and inventory $800, this to include food, condiments, souvenirs and perishable supplies.' "

The trial court's reasoning seems to be that where no mention is made of false representation at discussion and signing of purchase agreement, and where purchase agreement divides. purchase. price into 3 separate items (per liquor control commission requirements), the previous representation of the past gross sales figure is not material to the pur-

chase and could not, therefore, have been one of the elements of inducement.

The factually decisive issue the trial court should have decided was whether the defendant's advertised misrepresentation exerted a material influence upon the minds of plaintiffs, although it might be only 1 of several motives, acting together, which produced the result. Smith on Fraud, p 83; *Massey* v. *Luce,* 158 Mich 128, 135. A negative answer cannot be inferred solely from the fact the parties entered into a written contract which contained no mention of the gross sales representation.

The trial court did not test the factual situation in the light of this rule of law.

Under the authority of *Schneider* v. *Pomerville,* 348 Mich 49, the cause is remanded with direction that the trial court test the factual situation in light of the rule of the *Massey Case.*

On remand, either side may present additional testimony on any of the questions in the case. If the determination, to be made by written opinion making detailed findings of fact and specific findings of law, be in defendant's favor, a new judgment of no cause of action shall be entered; if in plaintiffs' favor, a new judgment shall enter for such damages in amount as may be found on retrial.

Remanded accordingly. Costs of this Court and of the trial court shall abide and be taxed according to the final result.

Black, Souris, Smith, and O'Hara, JJ., concurred with Kavanagh, J.

Kelly, J. (*dissenting*). The trial court found that "the statement in the advertisement did not enter into the transaction as a motivating cause and inducement of this sale." The record sustains such a

finding and this finding was supported by the· plaintiff's own testimony, as well as many other facts, in addition to what happened at the time of the transaction in attorney McNamara's office that culminated in the written agreement.

Plaintiff Gerald D. Callihan had for 2 years attended the school of business administration at Central Michigan at Mount Pleasant and Michigan State University, and was a man of business experience having managed 2 different golf courses as well as owning the Beaverton Hotel, at Beaverton, Michigan, and operating same as a licensee.

Plaintiffs did not purchase the property here involved on the spur of the moment. At least 5 different conferences were held between plaintiffs and defendant from the time plaintiffs first inspected defendant's property to the signing of the purchase agreement.

Plaintiff Gerald Callihan testified on direct examination that he first learned defendant's property was for sale when he read an advertisement for same in the Detroit News. However, on cross-examination when plaintiff was confronted with a letter he had written stating that he first knew of defendant's property through the State Wide Real Estate, of Gaines, Michigan, and when asked how he reconciled that statement with the testimony he had given on direct examination, plaintiff first answered, "I surmise that probably Mr. Talkowski called me, because of what Mr. Voorhies (of State Wide Real Estate) had told him about the place." Later, while still being cross-examined about the discrepancy as disclosed by his letter, he stated that when he wrote the letter, "I didn't mean exactly what I said."

For impeachment purposes, defendant called Mr. Voorhies to the stand. He testified that plaintiff contacted him and he drove to plaintiff's home in Port Huron; that when plaintiff advised him of his

financial status and stated that he wanted to trade his Port Huron home for northern Michigan property, he informed plaintiff he had nothing to offer and, therefore, there was no reason for him to go through plaintiff's home, but that he (Voorhies) was informed defendant had property for sale and might trade; that inasmuch as defendant had not listed his property with him, plaintiff was at liberty, if interested, to contact defendant; that plaintiff did not mention that he had heard of defendant's property, and Voorhies testified: "I don't believe he knew of it."

Plaintiffs did not even attempt to explain or refute Voorhies' testimony.

Added to plaintiff Gerald Callihan's unsatisfactory testimony as to how he learned defendant's property was for sale, was the equally unsatisfactory testimony in regard to plaintiffs' efforts to ascertain certain facts in regard to the defendant's property that they finally purchased.

Defendant and his wife testified that from the start of negotiations they informed plaintiffs they had not owned the property for a year and that the $29,000 gross sales figure was not their figure. This is evidenced by the following answers:

"Well, we told them—we talked over a lot of things, and we told them the gross, the $29,000 gross had been given to us by the previous owners and that we were not going to have that gross because the business was down."

"Yes. We discussed the fact that I just bought it the previous late summer, and that I had operated up to that point, and I was getting into the real-estate business and I wanted to sell for the reason of my real-estate business and my wife's ill health."

Plaintiff Gerald Callihan not only denied that he had been so informed by defendant, but claimed that

he did not ascertain during all his conferences with defendant how long defendant had owned and operated the business. This is indicated by the following questions and answers on plaintiff's cross-examination:

"*Q.* How long had he (defendant) owned it?
"*A.* That I don't know. He never told me how long he owned it.
"*Q.* You never knew how long he had it.
"*A.* No; I don't know how long he owned it.
"*Q.* Did you know why he was selling out?
"*A.* He told me it was because of his wife's health, the reason he was selling it. In fact, I think he advertised it to that extent, due to sickness, he was going to sell, even with the new bridge being put in.
"*Q.* Did you know whether or not he had operated it for a year?
"*A.* No; I didn't. * * *
"*Q.* Did you ask about the business for previous years, other than this $29,000 gross?
"*A.* No; I don't think so.
"*Q.* Didn't it occur to you that it might be wise to find out how he did the year before that?
"*A.* I thought possibly he was taking an average for the time he had been there.
"*Q.* Did he say he was taking an average?
"*A.* I didn't say that."

While plaintiff claimed he endeavored to examine defendant's books, his evidence in that regard is not only not convincing but, in many respects, is not plausible, as evidenced by the following questions and answers:

"*Q.* And, you stated, Mr. Callihan, that you asked several times to see the books.
"*A.* I did that.
"*Q.* But were never successful.
"*A.* No. His bookkeeper always had them. We only could come on a weekend.

"*Q.* Were you informed where the bookkeeper's office was?

"*A.* No. He told me the bookkeeper lived in St. Ignace. That is all he told me. I don't even know his name.

"*Q.* Then if you were so concerned about this, don't you think it would have been important to actually find out before—

"*A.* It would have been, if I had had the opportunity to come over here during the week, but I didn't have at that time.

"*Q.* Well, if you had gone ahead and asked once and was told that they were in St. Ignace, or some place else, and he didn't have them, then accepted it, as you say, it might have been different, but wasn't it quite strange that you would ask several times and then acquiesced in it by going ahead and signing up for the deal?

"*A.* I believe, Mr. Brown, I asked twice, and he did promise to get them for me. He said, 'I will have them for you the next time you come up.'

"*Q.* Were you suspicious when you didn't get them then?

"*A.* Not particularly. He seemed like an honest person. I had his advertising; I had his word for the gross sales.

"*Q.* Didn't you say you asked several times to see the books?

"*A.* No; I think maybe 2 or 3 times. *    *    *

"*Q.* Now, when you went back up to Cut River after this Port Huron meeting, you asked again to see the sales tax return, did you not?

"*A.* I think that is possibly the first time I asked to see them. I don't know as I asked to see them the first time I was up there.

"*Q.* Oh. How many times were you up there?

"*A.* I think about 4 times.

"*Q.* You didn't ask the first time; you did the second. How about the third time?

"*A.* I think I asked the third time.

"Q. The fourth time?

"A. The fourth time is when he was supposed to have them for me. He said, 'I will get them for you and have them for you the next time you come up.'

"Q. You were quite concerned, if you asked 3 different times.

"A. Yes; I was concerned.

"Q. What all of a sudden made you decide that he was honest and trustworthy and didn't have to have them?

"A. Well, he was a licensed real-estate salesman.

"Q. Didn't you know that the first time?

"A. I didn't know it the first time; no.

"Q. When did you find out he was a licensed real-estate salesman?

"A. When I first came up here he told me he was a licensed real-estate salesman out of Gaines, working under Voorhies.

"Q. Then you did know it the first time.

"A. Not before I came up I didn't. I knew it after I got up here; yes, because he told me that.

"Q. Well, if you were ready to trust his figures because he was a licensed real-estate salesman, why did you continually ask for them after that?

"A. Well, I didn't entirely trust him on that basis; I told him I did trust him, but I would like some other means of knowing that that was the right figure.

"Q. Then the amount of trust that you had in him did change, because you did go ahead with the deal without seeing the figures.

"A. Yes. He assured me that he wouldn't lie about it. He says that is straight facts. * * *

"Q. Now, when you had these several conferences with Mr. Talkowski, you went into details on taxes and expenses, gas and electricity and other things, did you not?

"A. Yes, sir.

"Q. I would still like to know what changed your mind from insisting upon seeing the books, and then

not having seen them, you went ahead and entered into the deal.

"*A.* I didn't insist on them. I asked if he was agreeable on letting me see them, and he said, 'Why, certainly.' And he said, 'But, my bookkeeper has them in St. Ignace,' and he promised to get them.

"*Q.* He didn't tell you where you could go and see them? You didn't ask who the bookkeeper was? Did he ever say that you couldn't go and see them?

"*A.* No; he didn't.

"*Q.* Wouldn't that have been quite easy to do?

"*A.* Hardly very easy, when I was up there just on a weekend.

"*Q.* Well, were all these deals on weekends, the closing deal too?

"*A.* Yes, sir.

"*Q.* Wouldn't it have been worth it to go and see the books?

"*A.* It possibly would, if I hadn't trusted him. I say I trusted and relied on the information he gave me and on his advertising.

"*Q.* But you didn't rely on it at first.

"*A.* Not entirely, Mr. Brown.

"*The Court:* I think we have covered that question."

Edward G. McNamara, Jr., St. Ignace attorney, represented both plaintiffs and defendant. He testified that in the several conferences leading up to the signing of the contract there was no conversation as to the $29,000 gross sales figure.

The trial court in its opinion called attention to the fact that in cases of this type the proof must be "clear and satisfactory," and "clear and convincing," and, deciding plaintiffs had failed to meet this test, the court stated:

"There was no reliance by the Callihans upon the item of $29,000. The whole effort of plaintiffs' counsel in this case has been to draw the $29,000 statement into the deal as a representation that was

the foundation and inducement of the transaction. Whatever the gross profits were prior to the sale, did not concern the parties at the McNamara conference when the agreements were made. The agreements themselves show the parties had openly agreed on a fixed price and that price was broken down into 3 categories and the parties fully understood that this deal hinged on a fixed price and definite inventory and personal property."

In *Merrill* v. *Shumway,* 367 Mich 14, 16, 17, we said:

"It is not the function of this Court, in an appeal from a trial court's decision on the facts in a non-jury law action, to hear the matter *de novo* and substitute our judgment for that of the trial court as to what the facts are as established by the proofs. Our determination in that regard is limited solely to whether the trial court's finding of facts is against the clear preponderance of the evidence. *Noyce* v. *Ross,* 360 Mich 668; *Lynes* v. *J. R. Heineman & Sons, Inc.,* 363 Mich 276; *Houghton* v. *Roberts,* 357 Mich 223; *Gocha* v. *Fetterolf,* 363 Mich 344."

We have repeatedly stated that this Court recognizes the advantage of seeing and hearing the witnesses and that we rely upon the trial court's judgment on questions of fact.

Rather than to accept plaintiffs' claim that they blindly relied upon an advertisement in the newspaper, and did not even try to ascertain whether the seller had owned and occupied the property for 1 year, 2 years, or 5 years, it is more plausible to conclude that plaintiffs were relying on an increased future business due to the completion of the bridge across the straits and the end of a steel strike and that plaintiffs were very desirous of being able to consummate the deal, getting a $7,100 credit for a $2,900 equity, plus the opportunity to purchase the property with a cash down payment of only $150.

The trial court's findings of fact were not against the clear preponderance of the evidence, and I disagree with Justice KAVANAGH that the trial court came to his conclusion by applying "an erroneous principle of law." I, therefore, vote to affirm. Costs to appellee.

CARR, C. J., and DETHMERS, J., concurred with KELLY, J.