UNITED STATES FIDELITY & GUARANTY COMPANY v BLACK

Docket No. 63656. Argued October 7, 1980 (Calendar No. 4).—Decided
November 23, 1981.

United States Fidelity & Guaranty Company brought an action
against Chase Black, Phillip C. Haughey, and AHB Associates,
Inc., under an indemnity agreement, for reimbursement of
claims which the plaintiff paid on the labor and materials bond
for a housing project the defendants owned in Battle Creek.
The defendants made the indemnity agreement to help the
general contractor, Kwaske Brothers Construction Company,
obtain the bonds required for financing of the project by the
Michigan State Housing Development Authority. They raise
the affirmative defense of fraud, claiming that they were ad-
vised that among the plaintiff's special conditions for under-
writing the bond were that the defendants sign an indemnity
agreement; that Jackson City Bank subordinate to the plaintiff
a secured interest in certain assets of the Kwaske brothers; and
that indemnity agreements be obtained from the Kwaske broth-
ers and certain others. The loan to finance the housing project
was made on December 28, 1971, and the defendants signed the
indemnity agreement on June 20, 1972. They testified that in
deciding to sign the agreement they relied on representations
by the insurance agents who obtained the bond from the
plaintiff that the other underwriting conditions had been met.
Later they discovered that the Jackson City Bank had not
subordinated its secured rights in the collateral and that not

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 37 Am Jur 2d, Fraud and Deceit §§ 187, 188.
[2] 17 Am Jur 2d, Contracts §§ 151, 152.
    37 Am Jur 2d, Fraud and Deceit § 74.
[3] 37 Am Jur 2d, Fraud and Deceit §§ 185, 188, 189.
[4] 37 Am Jur 2d, Fraud and Deceit §§ 220 et seq., 340.
[5, 7, 12] 17 Am Jur 2d, Contracts § 152.
    37 Am Jur 2d, Fraud and Deceit §§ 178, 461, 477.
[6, 7] 37 Am Jur 2d, Fraud and Deceit § 227.
[8-10] 37 Am Jur 2d, Fraud and Deceit § 146 et seq.
[11] 37 Am Jur 2d, Fraud and Deceit § 323 et seq.
[12] 37 Am Jur 2d, Fraud and Deceit §§ 222, 340.

all of the other indemnity agreements had been made. The Calhoun Circuit Court, Stanley Everett, J., granted judgment for the plaintiff, deciding that the affirmative defense of fraud was not established because there was no proof that the plaintiff intended to induce the defendants to act on any misrepresentations, and that the plaintiff had no affirmative duty to advise the defendants that not all of the conditions had been met. The Court of Appeals, D. C. Riley, P.J., and V. J. Brennan and Crockett, JJ., affirmed in an unpublished per curiam opinion (Docket No. 78-1161). The defendants appeal.

In an opinion by Justice Williams, joined by Justices Levin, Fitzgerald, and Moody, the Supreme Court *held:*

When the defense is "innocent misrepresentation", it is not necessary for the defendants to prove that the plaintiff or its agents had a fraudulent intent or intended that the misrepresentations would be acted on by the defendants in signing the indemnity agreement because the parties were in privity of contract and the benefit of the misrepresentation inured to the plaintiff.

1. The general common-law rule that to constitute actionable fraud a material misrepresentation must be made with the intention that it be acted upon has been modified in Michigan by the "innocent misrepresentation" rule, which is still the law. The terms "actionable fraud" or "actionable fraudulent misrepresentation" encompass more than the traditional common-law definition of fraud in that they apply in some cases where the misrepresenter had no *scienter.* If there was in fact a misrepresentation and its deceptive influence was effective, the consequences to the victim being as serious as though it had proceeded from a vicious purpose, the victim has an action for the damages caused by it, where the misrepresentation is made in connection with making a contract between the parties and the loss of the party deceived inures to the benefit of the other. There is no distinction in the requirements for an action to recover damages for innocent misrepresentation and for innocent misrepresentation as an affirmative defense to an action to enforce a contract because in both instances the object is to make the injured party whole.

2. The rule of innocent misrepresentation differs from the traditional rule of fraud by eliminating the element of *scienter* and the requirement of proof of the intention that the misrepresentation be acted upon. However, the misrepresentation which is innocent must be made in connection with the formation of a contract, and the injury suffered by the victim must inure to the benefit of the misrepresenter. It is unnecessary to

prove a fraudulent intent of the misrepresenter where the representation is made in a transaction between the misrepresenter and the victim, because the misrepresenter should realize that the misrepresentation would be relied upon by the victim. Whenever parties engage in contractual negotiations they are attempting to persuade each other to accept proposed terms, and they form a mutually agreeable contract based upon the representations made in the course of bargaining. Thus, in cases where there is privity of contract, all representations may be presumed to be made for the purpose of inducing the other party to enter the contract.

3. In this case the plaintiff, through its agents, appears to have represented to the defendants that other parties had signed the indemnity agreement and that the Jackson City Bank had subordinated its secured interest in the assets of the Kwaske brothers. The defendants obviously wished to spread their potential liability over as many parties as possible and to subordinate their liability to as many indemnitors as possible; they indicated the importance of their concern by inquiring, on several occasions, whether all of the requirements for the bonds had been met. The plaintiff wanted the indemnity agreement signed, and the plaintiff's agent misrepresented a material fact in the course of trying to get the defendants to sign the agreement. Whether the misrepresentation was intentional or unintentional it is evident that the agent made the misrepresentation with the hope that the defendants would act upon it by signing the indemnity agreement. Independent proof of the plaintiff's intent is unnecessary because a material statement made in the course of contractual negotiations is presumptively made with the intention that it should be relied upon by the other party.

4. The test for reliance on the misrepresentation is whether it exerted a material influence on the mind of the complaining party in deciding to sign the agreement, although it might be only one of several motives, acting together, which produced the result. The misrepresentation need not be the sole influence upon the complaining party. The trial court found that the defendants, in deciding to sign the indemnity agreement, relied in part on the representation that other persons would be liable in the event that indemnification was required. The fact that the defendants did not sign the indemnity agreement until after the plaintiff abandoned its demand that the defendants' wives also sign in no way requires the conclusion of the trial court that the defendants did not rely on the misrepresentation that the other underwriting requirements were satisfied. The

trial court found that the defendants relied in part on the plaintiff's misrepresentation, which is sufficient to establish an affirmative defense of fraud. The facts that the defendants may have had other motives to sign the indemnity agreement and continued to bargain on other issues before signing the indemnity agreement do not change the conclusion that they relied on the misrepresentations.

5. Fraud may be committed by the suppression of facts and of the truth, as well as by open false assertions, where there is a legal or equitable duty of disclosure. The trial court concluded that the plaintiff had no duty to disclose to the defendants that the underwriting requirements for the bonds had been modified because the plaintiff did not know, nor reasonably should have known, of the defendants' reliance on the underwriting requirements. However, two employees of an insurance agency who dealt with the defendants were agents of the plaintiff in this matter. The insurance agents knew or reasonably should have known that the defendants were relying on the completion of all the underwriting requirements for the bond, and that knowledge is imputed to the plaintiff.

6. The general rule is that a party to a business transaction is under an obligation to exercise reasonable care to disclose to the other party, before the transaction is consummated, any subsequently acquired information which he recognizes as rendering untrue, or misleading, previous representations which, when made, were believed to be true. When the insurance agents discovered that their representations concerning the underwriting requirements for the bond were inaccurate they had a duty to advise the defendants because they knew that the defendants were concerned whether all the other parties had signed the indemnity agreement. Whether there was a satisfaction of the duty to inform the defendants must be considered by the trial court on remand.

7. The trial court's confusing and contradictory findings of fact as to what statements constituting a misrepresentation were made and at which time they were made requires clarification upon remand. If any of the statements exerted a material influence on the defendants' final decision to sign the indemnity agreement and if they were false, the defendants have established the affirmative defense.

8. The defendants seek to have the entire indemnity agreement set aside; however, if the trial court finds that the defense of misrepresentation has been established, it must decide which remedy would be the most equitable under the circumstances of the case. The court is not confined to the remedies sought by

the parties, full enforcement or total abrogation of the indemnity agreement. It may consider other remedies such as reformation of the contract, restitution, or partial enforcement of the contract.

Reversed and remanded to the trial court for further proceedings.

Justice Kavanagh, joined by Justice Ryan, agreed that the matter must be remanded for clarification. However, he wrote separately because the claim of misrepresentation here is asserted as a defense to the enforcement of a contract, and discussions of innocent misrepresentation, fraudulent misrepresentation, and silent fraud, while appropriate to a suit for damages, may confound the confusion in this case. The defendants claim that they were induced to enter into the contract by the misrepresentations of the plaintiff's agents. If the trial court finds that the plaintiff's agents made a representation of a material fact, that the representation was false, and that the defendants relied on the representation as all or part of the inducement to enter into the contract, the trial court should grant relief to the defendants; otherwise it should enforce the contract.

*Candler v Heigho,* 208 Mich 115; 175 NW 141 (1919), overruled in part.

### OPINION OF THE COURT

1. FRAUD — MISREPRESENTATION — INTENT — COMMON LAW — WORDS AND PHRASES.

   The general common-law rule that to constitute actionable fraud a material misrepresentation must be made with the intention that it be acted upon has been modified in Michigan by the "innocent misrepresentation" rule; the terms "actionable fraud" or "actionable fraudulent misrepresentation" encompass more than the traditional common-law definition of fraud in that they apply in some cases where the misrepresenter has no *scienter.*

2. FRAUD — MISREPRESENTATION — INTENT.

   Where there was in fact a misrepresentation, even though made innocently, and its deceptive influence was effective, the consequences to the victim being as serious as though it had proceeded from a vicious purpose, the victim has an action for the damages caused by it where the misrepresentation is made in connection with making a contract between the parties and the loss of the party deceived inures to the benefit of the other.

3. FRAUD — MISREPRESENTATION — INTENT.

Any representations made by one party to another in a transaction between them which are false in fact and actually deceive the other party, and are relied on by him to his damage, are actionable, where the loss of the party deceived inures to the benefit of the other; it is unnecessary for the plaintiff to prove a fraudulent purpose or intent on the part of the defendant.

4. FRAUD — CONTRACTS — MISREPRESENTATION — INDUCEMENT — INTENT.

There is no distinction in the requirements for an action to recover damages for innocent misrepresentation and for innocent misrepresentation as an affirmative defense to an action to enforce a contract in Michigan because in both instances the object is to make the injured party whole.

5. CONTRACTS — MISREPRESENTATION — INDUCEMENT — INTENT.

It may justifiably be presumed in a contractual bargaining situation that all material representations by a party are made with the intention to induce the other party to enter into the contract; thus, in cases involving privity of contract independent proof of intent to induce reliance on a misrepresentation is unnecessary to maintain an action in deceit or to establish the defense of fraud in the inducement of a contract.

6. CONTRACTS — FRAUD — INDUCEMENT — RELIANCE.

The test in a case of fraud in the inducement for determining the existence of reliance on a misrepresentation is whether it exerted a material influence on the mind of the complaining party, although it might be only one of several motives, acting together, which produced the result of formation of a contract.

7. CONTRACTS — FRAUD — INDUCEMENT — RELIANCE.

A trial court erroneously concluded that the defendants in an action for reimbursement under an indemnity agreement had not established the affirmative defense of fraud in the inducement where the court found that the defendants in signing the indemnity agreement relied in part on misrepresentations by the plaintiff's agents that other parties would be liable before the defendants would be liable in the event that indemnification was required; the facts that the defendants may have had other motives to sign the indemnity agreement and they continued to bargain on other issues before signing the indemnity agreement do not change the conclusion that they relied on the misrepresentations.

8. FRAUD — SILENCE — DUTY TO DISCLOSE.

Fraud may be consummated by suppression of facts and of the truth where there is a legal or equitable duty of disclosure; one who remains silent when fair dealing requires him to speak may be guilty of fraudulent concealment.

9. FRAUD — SILENCE — DUTY TO DISCLOSE — KNOWLEDGE — AGENCY.

A trial court erroneously concluded that a plaintiff underwriter had no duty to defendants who were negotiating an indemnity agreement required by the underwriter for performance bonds to disclose that the underwriting requirements for the bonds had been modified where the trial court specifically found that two employees of an insurance agency were agents of the plaintiff underwriter; the defendants had discussed with the agents their concern about potential liability under the indemnity agreement and were openly trying to limit that liability; and the agents knew, or should have known, that the defendants were relying on their representations that all the underwriting requirements had been met.

10. FRAUD — SILENCE — DUTY TO DISCLOSE.

A party to a business transaction generally is under an obligation to exercise reasonable care to disclose to the other party, before the transaction is consummated, any subsequently acquired information which he recognizes as rendering untrue, or misleading, previous representations which, when made, were true or believed to be true.

11. REMEDIES — CONTRACTS — FRAUD IN THE INDUCEMENT — EQUITY.

Where the equitable defense of fraud in the inducement of a contract has been established the trial court must decide which remedy would be the most equitable under the circumstances; the court may consider abrogation, reformation, partial enforcement of the contract, or restitution as achieving the most just result.

SEPARATE OPINION BY KAVANAGH, J.

12. CONTRACTS — MISREPRESENTATION — INDUCEMENT — RELIANCE.

*A claim of misrepresentation by the plaintiff's agents as a defense to the enforcement of a contract has been established if the trial court finds that the plaintiff's agents made a representation of a material fact, that the representation was false, and that the defendants relied on the representation as all or part of the inducement to enter into the contract.*

*Foster, Swift, Collins & Coey, P.C.* (by *Philip T. Carter*), for plaintiff.

*Vandervoort, Cooke, McFee, Christ, Carpenter & Fisher (Dykema, Gossett, Spencer, Goodnow & Trigg,* by *Michael J. McGuigan* and *Carolyn D. Bell,* of counsel) for defendants.

WILLIAMS, J. *(for reversal).* This case, involving suit on an indemnity contract and a defense of innocent misrepresentation, is confusing for four reasons. First, the Court of Appeals in its decision confused the elements in the traditional fraudulent misrepresentation rule and the elements in the Michigan innocent misrepresentation rule. Both the Court of Appeals and the trial court erred in trying to decide an innocent misrepresentation case on the basis of the failure to prove an element required in the traditional fraudulent misrepresentation rule but not required under the innocent misrepresentation rule. Second, the trial court, although purporting to recognize the legal rule that it was sufficient that the "misrepresentation exerted a material influence", inconsistently and erroneously acted as though the influence had to be total and exclusive. Third, the trial court erroneously failed to permit the defendants to attempt to prove the affirmative defense of silent fraud, saying the plaintiff had no duty of disclosure. However, the record indicates that there was indeed evidence which could substantiate such a duty. And fourth, in determining whether a misrepresentation had actually been made the trial court made contradictory statements so that it is impossible to conclude for certain whether or not a misrepresentation was made that the victims, in this case the defendants, relied on.

Because of the errors above mentioned, the

Court of Appeals affirmance of the trial court is reversed. However, because it is unclear whether the trial court did or did not find that plaintiff in fact made a misrepresentation on which defendants relied and because the trial court erroneously dismissed the possibility of silent fraud, the matter is remanded to the trial court for further consideration. The nature of the equitable remedy is discussed.

## I. Facts

Appellants Chase Black, Phillip Haughey and AHB Associates, Inc. (AHB), are defendants in an action for reimbursement by plaintiff-appellee United States Fidelity & Guaranty Company (USF&G) pursuant to an indemnity agreement dated December 28, 1971, but actually signed by the defendants on June 20, 1972. AHB is the developer of the Glenwood Trace Housing Project in Battle Creek and the general partner of the Glenwood Trace Limited Dividend Housing Association which owned the project. Black and Haughey, as stockholders and officers of AHB, desired to obtain financing for a low- and medium-income housing project from the Michigan State Housing Development Authority (MSHDA). To do so, however, required that the general contractor furnish labor and materials payment and performance bonds.[1] After accepting bids from prospective contractors in late 1971, defendants hired the Kwaske Brothers Construction Company on the condition that it could satisfy the MSHDA's bond requirement.

[1] The surety of a labor and materials payment bond agrees to pay parties furnishing labor and materials to the project if the contractor is unable. A performance bond assures the lender and owner of the project that the construction will be completed by the surety if the contractor fails to complete it.

Kwaske Brothers went to Mourer-Foster, Inc., a Lansing insurance agent, for assistance in finding an underwriter willing to furnish the necessary bonds. After negotiations with Capitol Indemnity Company were abandoned due to exorbitant rates and stiff underwriting requirements,[2] a Mourer-Foster employee, Albert Neubacher, contacted his former employer, USF&G. At first the underwriter refused to issue the bonds to Kwaske Brothers, but reconsidered provided certain conditions were performed.

On December 18, 1971, another Mourer-Foster employee, Myron Montie, met with Gerald Kwaske and defendant Black at defendant's offices and presented the following four bonding requirements of USF&G:

"1. The four Kwaske brothers, as officers of the general contractor, and their wives were to sign an indemnity agreement in favor of USF&G for amounts paid by USF&G under the bonds;

"2. Kwaske Brothers' bank, Jackson City Bank of Jackson, Michigan, was to subordinate its rights to certain assets of Kwaske Brothers and the Kwaskes individually to USF&G;

"3. Three major subcontractors and one material supplier (heating, plumbing, electrical and lumber) were to become liable on the bond by signing a surety or indemnity agreement; and

"4. AHB Associates, Phillip Haughey, Chase Black and their wives were to sign an indemnity agreement."

Black objected to Montie about the extensive lia-

_____

[2] Kwaske Brothers was rather "lightly capitalized" and had had some trouble with the construction of student housing in Mt. Pleasant for Central Michigan University resulting in a $70,000 loss. Apparently neither Aetna Life Insurance & Casualty Company, who wrote the Mt. Pleasant construction bond, nor Capitol Indemnity wished to take the risk of bonding Kwaske Brothers unless certain, unnamed, requirements were met and the normal bond rates were increased.

bility defendants were asked to assume. He re-
peated these objections to Neubacher, the head of
Mourer-Foster's Bond Department, but the re-
quirements were reaffirmed. After evaluating the
bond conditions against their potential liability,
Black and Haughey agreed to sign the indemnity
agreement provided their wives were omitted from
the bond and USF&G agreed to include a priority
of collection so that if indemnification were re-
quired, defendants would be the last indemnitors
pursued.

The loan closing meeting was held at the
MSHDA office in Lansing on December 28, 1971.
Neubacher signed the labor and materials pay-
ment and performance bonds for USF&G in accor-
dance with a written power of attorney. Black
testified that he specifically asked Neubacher
whether all of the other conditions imposed by
USF&G had been satisfied and was told that USF
&G "had obtained all of the conditions".[3] In the
following months Neubacher made several re-
quests for defendants to execute the indemnity
agreement. One such attempt occurred on March
28, 1972, when Neubacher personally delivered a
copy of the indemnity agreement to Black. At-
tached to the agreement was a photocopy of a
letter to Neubacher from USF&G Bond Superin-
tendent J. Edwin Pohl dated February 4th, stating:

"As you know, we are *still awaiting* certain papers to
complete our file on this bond. We *are to receive* a
Master Surety Agreement and resolution and certifica-
tion signed by Kwaske Brothers Construction Company,
Mr. and Mrs. Eugene Kwaske, Mr. and Mrs. Gerald
Kwaske, Anthony Kwaske and Ernest Kwaske. We *are*

---

[3] Neubacher testified: "I don't know what my discussions were
exactly on the day of the closing with all that's involved at a closing,
but I'm sure I had some discussion of some sort with Mr. Black".

*also to receive* a specific indemnity agreement and resolution and certification signed by Chase Black, Phillip C. Haughey and AHB Associates, Inc. A letter from the City Bank of Jackson is *also to be received,* subordinating their interest to ours in connection with the blanket financing statement now in effect on Kwaske Brothers." (Emphasis added.)

Black admitted having read the letter at the time. When asked during cross-examination, "is it not true, from reading this, you were aware that the conditions that you were relying on had not at this time been satisfied?", Black responded:

"On the contrary, because I asked Mr. Neubacher what the situation was. That does not say that on March 28th that those were not available. It says on February 4th, they were not available. Mr. Neubacher responded that *those things had been taken care of* and this, our signature, our indemnity was the only thing yet remaining * * *." (Emphasis added.)

After the March 28th meeting with Neubacher, defendant Black sent a photocopy of the February 4th USF&G letter with the proposed indemnity agreement to his attorney with the following handwritten note at the bottom of the letter:

"3/28/72

"Bob—Al Neubacher came in this PM—wanting to talk about the attached 'Specific Indemnity Agreement.' I told him the wives *would not* be expected to sign, and that we wanted assurance that we were limiting ourselves after Kwaske Bros. Constr. Co., Inc., and after the three brothers personally.[4] He said thats *[sic]* what

---

4 The USF&G bond requirements called for the *four* Kwaske brothers and their three wives to indemnify plaintiff. Only two brothers and their wives actually signed the indemnity agreement. Thus it is unclear what Black meant to say when he wrote "after the *three* brothers personally".

all these papers mean. Do you agree. Please call me after reading them over.

"Chase".

(Emphasis in original.)

In the extreme bottom right hand corner of the exhibit, below the handwritten note, is a date stamp indicating that defendants' counsel received the letter on March 29, 1972.

Defendants Black and Haughey testified that they "put total reliance" on representations that there would be other indemnitors and that the Jackson Bank would subordinate its security interest in Kwaske Brothers' assets. They insisted that Neubacher told them that they were the last to comply with the bond requirements both before and after the delivery of the February 4th letter.[5] Neubacher denied ever making such representations.

USF&G agreed to remove appellants' wives' names from the indemnity agreement but refused to set up any type of priority among the indemnitors. Defendants finally signed the agreement on June 20, 1972 and mailed it to Mourer-Foster. It was not until March, 1973, that defendants discovered that the Jackson City Bank had not subordinated its rights to various assets of the Kwaske Brothers, and not until 1975 that defendants learned that only two of the four Kwaske brothers and their wives and only one of the subcontractors had signed the master indemnity contract.

Kwaske Brothers defaulted under its labor and materials bond when it failed to pay all of the

---

[5] Haughey testified: "[Neubacher] said that we had had a gentleman's agreement that we were going to sign the specific indemnity agreement and all of the other conditions of the bond had been met. We were the only people who had not fulfilled our gentleman's agreement."

material suppliers and subcontractors. USF&G intervened in accordance with the labor and materials bond and settled the claims. USF&G subsequently brought suit against those sureties who had signed the indemnity agreement in order to recover its expenses of $78,971.27 plus interest. The plaintiff obtained a default judgment against defendants Kwaske Brothers Construction Company, Kathleen and Mary Helen Kwaske, and subcontractor Schmidt Electric Company; however, Gerald A. Kwaske and Ernest Kwaske received discharges in bankruptcy, leaving defendants Black, Haughey and AHB to face the remaining liability. Anthony Kwaske, Eugene Kwaske and his wife, the Jackson City Bank, and the major subcontractors and material suppliers who had worked on the project were not included in the suit since they had not signed the specific indemnity agreement, or, in the case of the bank, subordinated its security interest in the assets of Kwaske Brothers.

After a three-day bench trial in late July 1977 and submission of post-trial briefs by all the parties, the trial judge in a sometimes confusing and contradictory finding stated *inter alia:*

Mourer-Foster and its employees Montie and Neubacher were agents of USF&G;

Defendants "relied, in part, upon the fact that there were others who would be liable in the event that indemnification was required";

However, "defendants did not rely on the December, 1971 statement, for they did not sign the indemnity agreement until several months later and then only after the agreement was modified to eliminate the requirement that their wives sign it";

Nevertheless the "preliminary statements were

made to the defendants and these were certainly a factor in their decision to sign the indemnity agreement";

Neubacher answered yes when asked on December 28, 1971 if all the bond requirements of December 18th had been met;

Defendants failed to establish that Neubacher repeated the assurances on March 28, 1972, that the other conditions of the bond requirements had been met;

"[T]here is a total absence of proof that the plaintiff or its agents *made any representations with the intention that these be acted upon* by the defendants" (emphasis added).

The trial court, relying on *Candler v Heigho,* 208 Mich 115; 175 NW 141 (1919), and its progeny, held that the affirmative defense of actionable fraud was not established due to the failure of proofs that USF&G intended to induce defendants to act upon any misrepresentation which may have been made. Similarly the trial court dismissed the argument that the doctrine of silent fraud applied, holding the plaintiff had no duty to speak since it "neither knew nor had any reason to believe that defendants' actions were governed at all by its own requirements". The Court of Appeals affirmed in a 1-1/2-page unpublished per curiam opinion. Leave to appeal was granted by this Court on April 17, 1980. 408 Mich 898 (1980).

## II. COURT OF APPEALS CONFUSION OF THE TRADITIONAL AND THE "INNOCENT" MISREPRESENTATION RULES

The pertinent part of the Court of Appeals opinion reads as follows:

"On appeal, defendants argue that the general rule that a material misrepresentation be made with the intention that it be acted upon has been modified by Michigan's "innocent misrepresentation" rule of fraud. We disagree. *Hi-Way Motor Co v International Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976), sets forth the elements of actionable fraud by quoting from *Candler v Heigho*, 208 Mich 115, 121; 175 NW 141 (1919), as follows:

" 'The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery.'

"Michigan's 'innocent misrepresentation' rule of fraud modifies element (3) of the aforementioned general rule, but has no effect upon element (4). *Phillips v General Adjustment Bureau*, 12 Mich App 16, 20; 162 NW2d 301 (1968), clearly states that it is the intent to deceive that is modified by the 'innocent misrepresentation' rule of fraud. Element (4) of the aforementioned general rule is required to be proven under Michigan's 'innocent misrepresentation' rule of fraud. *Phillips, supra.*"[6]

---

[6] The Court of Appeals reliance on *Phillips* is not well taken. Although *Phillips* quoted 23 Am Jur, Fraud and Deceit, § 120, p 908, reincorporated in 37 Am Jur 2d, Fraud and Deceit, § 195, p 257, for a summary of the innocent misrepresentation doctrine, the Court limited its analysis to the last section, holding: "Michigan requires a benefit to inure to the person making an innocent misrepresentation in order to render him liable to a party relying on it to his detriment". *Phillips, supra,* 20. Therefore, *Phillips* is not authority for the rule of *Candler* "(4) that he made it [the misrepresentation] with the intention that it should be acted upon by [the victim]". Quite the opposite, as *Phillips* cites American Jurisprudence to the contrary.

We note also that in Michigan the terms "actionable fraud" or "actionable fraudulent misrepresentation" are more encompassing than the traditional common-law definition of fraud in that they may apply to situations where the misrepresenter had no *scienter.*

The doctrine of "innocent misrepresentation" established by Justice COOLEY 115 years ago in *Converse v Blumrich,* 14 Mich 109, 123; 90 Am Dec 230 (1866), was restated in *Holcomb v Noble,* 69 Mich 396, 399; 37 NW 497 (1888) (MORSE, J., concurring), where Justice MORSE, although being "strongly impressed" with the majority rule "supported by abundant authority outside of our own State", found

"that the doctrine is settled here, by a long line of cases, that if there was in fact a misrepresentation, *though made innocently,* and its deceptive influence was effective, the consequences to the plaintiff being as serious as though it had proceeded from a vicious purpose, he would have a right of action for the damages caused thereby either at law or in equity." (Emphasis added.)

Accord, *Kroninger v Anast,* 367 Mich 478, 482; 116 NW2d 863 (1962); *Boss v Tomaras,* 241 Mich 540, 543; 217 NW 783 (1928); *Aldrich v Scribner,* 154 Mich 23, 25; 117 NW 581 (1908); *Busch v Wilcox,* 82 Mich 315, 336; 46 NW 940 (1890).[7] The innocent misrepresentation doctrine still obtains in Michi-

---

[7] Although there were a few isolated instances of other state and federal cases intimating that *scienter* is not required, see, *e.g., Smith v Richards,* 38 US (13 Pet) 26 (1839); *Smith v Babcock,* 2 Wood & M 246 (CCD Mass, 1846); *Tuthill v Babcock,* 2 Wood & M 298 (CCD Mass, 1846); *Lockridge v Foster,* 5 Ill 569 (1843); see, generally, Shapo, *A Representational Theory of Consumer Protection: Doctrine, Function and Legal Liability for Product Disappointment,* 60 Va L Rev 1109, 1172-1174 (1974), the doctrine of innocent misrepresentation remained pretty much "peculiar to our jurisprudence" for many years. *Aldrich v Scribner,* 154 Mich 23, 32; 117 NW 581 (1908). Over the past several decades, however, other states have abandoned the requirement of *scienter* in actions in fraud arising out of contractual misrepresentation. See, *e.g., Gulf Electric Co v Fried,* 218 Ala 684; 119 So 685 (1928); *Westerman v Corder,* 86 Kan 239; 119 P 868 (1912); *Maser v Lind,* 181 Neb 365; 148 NW2d 831 (1967); *McDaniel v Hodges,* 176 Va 519; 11 SE2d 623 (1940). As of this writing, however, the Michigan doctrine continues to be the minority position. See, generally, 37 Am Jur 2d, Fraud and Deceit, § 195, p 258.

gan today. We have found no case overturning or disapproving of *Converse* and its progeny.[8]

The rule of "innocent misrepresentation" is well expressed in a passage from *Phillips, supra,* p 20, quoting 23 Am Jur, Fraud and Deceit, § 120, p 908, reincorporated in 37 Am Jur 2d, Fraud and Deceit, § 195, p 257:

"The minority rule is followed in at least one state in a slightly more specific formulation; it is held that where an action is brought to recover for false and fraudulent misrepresentations made by one party to another [1] in a transaction between them, [2] any representations which are false in fact [3] and actually deceive the other, and [4] are relied on by him to his damage, are actionable, irrespective of whether the person making them acted in good faith in making them, [5] where the loss of the party deceived inures to the benefit of the other."

[8] Although if read literally *Candler v Heigho,* 208 Mich 115, 121; 175 NW 141 (1919), may appear to have adopted the majority rule by quoting 20 Cyclopaedia of Law and Procedure 13 with approval, closer examination shows this to be plainly not the case since *Candler* turned on plaintiff's failure to rely on the misrepresentation. As Justice SOURIS, writing for a unanimous Court, later noted when reviewing the innocent misrepresentation doctrine in light of *Candler* and its progeny:

"Unfortunately, without acknowledging the limited applicability in Michigan of the general rule stated in 20 Cyc * * * our opinions * * * made reference generally to its requirement of proof of knowledge. * * * But none of these cases required the Court to consider proof of *scienter,* or lack thereof. The decisions turned upon absence of proof of misrepresentation. We have found no case in Michigan contrary to the rule of *Converse v Blumrich,* when determination of the issue of *scienter* was necessary to the decision." *Irwin v Carlton,* 369 Mich 92, 97; 119 NW2d 617 (1963).

This remains true today even in light of *Hi-Way Motor Co v International Harvester Co,* 398 Mich 330, 336; 247 NW2d 813 (1976), where this Court once again cited 20 Cyc without acknowledging its limited applicability in Michigan. *Hi-Way Motor* turned on the absence of a misrepresentation and plaintiffs' failure to rely on the representations made. *Id.,* 336-337. So that there will not be any confusion as to this state's position concerning the doctrine of innocent misrepresentation we specifically overrule *Candler* insofar as it purports to hold that all six common-law requirements of fraud must be proven in an innocent misrepresentation case. As *Converse* and *Irwin* indicate, Michigan has never so required.

In comparing the traditional common-law rule as stated in the Court of Appeals opinion with the innocent misrepresentation rule set forth in American Jurisprudence, several significant differences appear.

1. The innocent misrepresentation rule occurs [1] in a transaction between the contracting parties, whereas no such requirement appears in the traditional rule.[9] The instant case of course involves a contract of indemnity.

2. The requirement of *scienter, i.e.,* knowledge of the falsity of the misrepresentation, is present in the traditional rule (3) but not present in the innocent misrepresentation rule [3] and [4]. The Court of Appeals correctly recognized this.

3. The traditional misrepresentation rule requires (4) that the misrepresentation be made with the intention that it should be acted upon by the victim. The innocent misrepresentation rule has no such requirement. The quotation from American Jurisprudence states [4] "irrespective of whether the person making them acted in good faith in making them". As to this point, of course, the Court of Appeals applied the traditional instead of the "innocent" misrepresentation rule. We shall discuss this further almost immediately.

---

[9] Writing for the majority of this Court Justice CARPENTER said:

"Nearly every suit to recover damages for fraud arises from a contract. The plaintiff sues to recover damages because he has been fraudulently induced to make that contract. The defendant may be, and generally is, the other party to that contract. Sometimes, however, the defendant is a third person, either the agent of the other party, or perhaps some one having no legal relation whatever to either party. For the purpose of determining whether the principle of the *Holcomb* and *Busch* cases is applicable, I draw a distinction between the suits brought against a party to the contract and the suits brought against those who are not parties to the contract. If it is brought against a party to the contract, that principle is applicable. If it is not brought against a party to the contract, that principle is not applicable." *Aldrich, supra,* 30.

4. Under the traditional misrepresentation rule it is sufficient that the victim (6) suffer an injury. Under the innocent misrepresentation rule, the victim [5] must not only suffer an injury but also the injury must inure to the benefit of the other.[10]

Briefly then, while the traditional and innocent misrepresentation actions are substantially similar, they are also significantly different. On the one hand, the innocent misrepresentation rule differs in eliminating *scienter* and proof of the intention that the misrepresentation be acted upon. However, on the other hand, the innocent misrepresentation rule adds the requirements that the misrepresentation be made in connection with making a contract and the injury suffered by the victim must inure to the benefit of the misrepresenter. Actually what this means is this: while it is unnecessary to show that the innocent misrepresenter knew his representation was false, it is necessary to show that not only does the victim suffer injury, but also the injury must inure to the misrepresenter's benefit. It also means, and this is the major legal issue in this case, that it is unnecessary to prove separately that the representer intended that the victim rely on the misrepresentation, because the representation must be made "in a transaction between them", where the misre-

[10] We note that many states adopting the strict common-law definition of fraud distinguish between an action brought in tort for fraudulent misrepresentation and an affirmative defense of misrepresentation in a contract enforcement suit. While the tort action, typically seeking damages, must prove all of the requirements in the quotation cited in *Candler,* such as *scienter* and intent to induce reliance, the affirmative defense of misrepresentation has a lesser standard. See 12 Williston, Contracts (3d ed), § 1487, pp 322-328. In Michigan, however, we have done away with the distinction in requirements when the parties to the suit are in privity of contract. Whether the doctrine of innocent misrepresentation is used to recover damages or as an affirmative defense rescinding or reforming the contract the requirements are the same, since in both instances the object is to make the injured party whole.

presenter should realize that the misrepresentation would be relied upon. This was implicitly recognized in *Boss v Tomaras,* 241 Mich 540, 543; 217 NW 783 (1928), where this Court held:

> *"It was unnecessary for plaintiffs to prove a fraudulent purpose or intent upon the part of defendants, or those representing them.* If defendants made representations to plaintiffs with reference to the value and condition of the farm and the personal property, and plaintiffs relied and acted upon them to their damage, and they were false, *the purpose or intention of defendants in making the representations would be immaterial."* (Emphasis added.)

Accord, *Essenburg v Russell,* 346 Mich 319, 323-324; 78 NW2d 136 (1956). *Goodrich v Waller,* 314 Mich 456, 467-468; 22 NW2d 862 (1946). See *Rosenberg v Cyrowski,* 227 Mich 508, 511; 198 NW 905 (1924).

Since the rule of innocent misrepresentation only applies to parties in privity of contract, the traditional requirement that the misrepresentation be made with the intention to induce the other party to act is automatically satisfied. Whenever a party engages in contractual negotiations that party attempts to persuade the other to accept the proposed terms, and vice-versa. The parties reach the goal of forming a mutually agreeable contract based upon the representations made in the course of bargaining. Thus, in situations involving privity of contract, all representations may be presumed to be made for the purpose of inducing the other party to enter the contract.

In the case at bar, USF&G, through its agents, appears to have represented to Black and Haughey that various parties had signed the indemnity agreement and that the Jackson Bank had subor-

dinated its security interest in the assets of
Kwaske Brothers. Defendants, as competent busi-
nessmen, were concerned in spreading their poten-
tial liability over as many parties as possible and
subordinating their liability to as many indemni-
tors as possible. They indicated this concern on
several occasions by inquiring whether all of the
bond requirements had been met. This was obvi-
ously an important consideration for defendants.
Plaintiff wanted the indemnity agreement signed.
As the months passed following the loan closing,
USF&G wrote increasingly demanding memos to
Neubacher inquiring when he would obtain the
signed indemnification agreements set forth in the
bond requirements. Neubacher in turn stepped up
his discussions with defendants. The trial judge
found that "statements made by Mr. Neubacher
subsequent to the closing would constitute a mis-
representation, although there was no evidence
that it was an intentional one". Whether inten-
tionally or unintentionally, Neubacher misrepre-
sented a material fact in the course of trying to
get defendants to sign the indemnity agreement. It
is evident he did so with the hope that defendants
would act upon it by signing the agreement. As
the above facts indicate, in a contractual bargain-
ing situation it may justifiably be presumed that
all material representations are made with the
intention to induce the other party to act, *i.e.,*
enter into the contract.

Therefore we hold that independent proof of
intent to induce reliance is unnecessary to main-
tain an action in deceit under the doctrine of
innocent misrepresentation inasmuch as a mate-
rial statement made in the course of contractual
negotiations is presumptively made with the inten-
tion that it should be relied upon. To the extent

that *Candler v Heigho, supra,* purports to require that every traditional common-law element of fraud must be specifically proven in a case of innocent misrepresentation, it is hereby overruled. See footnote 8 and accompanying text, *supra.*

### III. The Trial Court Misapplied the Rule That the Misrepresentation Need Only "Exert a Material Influence"

It is well settled in Michigan that the test for determining the existence of reliance is not whether the misrepresentation was the sole influence upon the complaining party in deciding to sign the agreement but rather is "whether the * * * misrepresentation exerted a *material* influence upon the minds of [the complainants], although it might be only 1 of several motives, acting together, which produced the result". *Callihan v Talkowski,* 372 Mich 1, 6; 124 NW2d 788 (1963) (emphasis added).

Was there such reliance in the case at bar? Defendant Black certainly indicated there was and minced no words in saying so:

"*[Defense Attorney McFee]:* Now, what reliance, Mr. Black, if any, did you put upon these—this conversation with Mr. Neubacher with regard to the indemnity agreement?

"*[Defendant Black]:* Put total reliance on it.

"*Q.* In what way?

"*A.* That all of the items that were told to us were conditions of the bond and that without any one of them, the bond would not be offered, would not be made available. That meant our signatures. That meant the bank's agreement; that meant Kwaske's signatures; that meant the subcontractors' agreements to sign the bond. All of them had to be there for the bond to be made. I, therefore, assumed that any one of them

missing, there would be no bond nor could any one be missing.

"*Q.* Well, now, I'm talking specifically, though, with regard to your willingness to sign an indemnity agreement which you eventually signed. What reliance or what consideration did you place on any of this conversation or these conditions?

"*A.* If any of these monetary conditions that had to do with Kwaske's money or his equipment or the contractor's money or the bank's subordination, if those were not present, we wouldn't have signed the bond. It would have placed us in total jeopardy.

\*  \*  \*

"We relied on the equipment being there for the bonding company to have as security. We relied on the working capital being available. We relied on that being available to the contractor and then to the bonding company. We relied on the assets of Kwaskes, of all the brothers and their wives, and we relied on the subcontractors signing the bond in that should there be a default, that their claims would not be made because they were guarantors under the bond. We relied on each of these totally."

From such testimony the trial judge found: "It is * * * apparent that the two men [Black and Haughey] *relied, in part,* upon the fact that there were others who would be liable in the event that indemnification was required" (emphasis added). The court also noted that while plaintiff considered the bond requirements as underwriting conditions, "[t]o the defendants, they were factors in determining the extent of their liability if they signed the agreement. * * * As a result, I find that preliminary statements were made to the defendants and *these were certainly a factor in their decision to sign the indemnity agreement*" (emphasis added).

Therefore, following the rule in *Callihan* the trial judge should have ineluctably come to the

conclusion that the defendants did rely on plaintiffs' misrepresentations.

However, inconsistently with the *Callihan* rule, he concluded:

"It is clear to me that the defendants did not rely on the December, 1971 statement *for they did not sign the indemnity agreement until several months later* and then *only after the agreement was modified to eliminate the requirement that their wives sign it.* The effect of the December, 1971, statement by Neubacher cannot be overlooked, however, but may only be considered along with other acts of plaintiff and its agents in determining whether defendants have established their affirmative defense." (Emphasis added.)

This conclusion contains both internal inconsistencies and a failure to follow the rule of *Callihan.* The fact that defendants did not sign the indemnity agreement until after plaintiff abandoned the requirement that the defendants' wives become co-indemnitors in no way requires the conclusion that the defendants did not rely on the misrepresentation that the other bond requirements were satisfied. It is a complete *non sequitur.* On the contrary, it may even be considered evidence that defendants were sure the other requirements were satisfied, because there is no evidence that they had given up on those requirements.

Nor is the trial court's holding that defendants failed to rely on the December, 1971 misrepresentations consistent with its own understanding of *Callihan.* The trial judge, in specifically recognizing the applicability of *Callihan,* correctly paraphrased the rule: "If plaintiff's misrepresentations *exerted a material influence* on the minds of defendants *although* it might be *only one of several motives acting together,* which produced the re-

sult, this is sufficient reliance." (Emphasis supplied.) Having found that defendants "relied in part" upon plaintiff's misrepresentations and that the assurances that all the bond requirements had been met "were certainly a factor in their decision to sign the indemnity agreement" the trial judge nevertheless, inexplicably, found there was no reliance on the December, 1971 misrepresentation. Since the defendants "relied in part" on plaintiff's misrepresentations, that should have been sufficient under the *Callihan* rule. That the defendants did not immediately act upon plaintiff's misrepresentation, *i.e.,* sign the indemnity contract, but instead continued to bargain on other issues had nothing to do with whether defendants did or did not rely on plaintiff's misrepresentations. The trial court's argument here is erroneous.

## IV. SILENT FRAUD

Defendants also raise the affirmative defense of silent fraud. They point out that during the negotiations leading up to the closing USF&G had flatly stated that all of the enumerated bond requirements had to be satisfied, or at least agreed to, prior to the issuance of the labor and material and the performance bonds. They claim that plaintiff's agents saw or should have seen that defendants would rely on plaintiff's insisting on these conditions, because defendants showed they were very concerned with their potential liability and were looking to the other indemnitors sharing any indemnification with defendants. The defendants therefore argue that plaintiff had a duty to inform them of the reduction in the bond requirements. In addition, since Montie and Neubacher repeatedly assured defendants that they were the only parties who had not signed the indemnity agree-

ment, the two agents had a duty to inform defendants of the misstatement when they discovered that many of the bond requirements had not been satisfied.

It is generally recognized that "[f]raud may be consummated by suppression of facts and of the truth, as well as by open false assertions", *Fred Macey Co v Macey,* 143 Mich 138, 153; 106 NW 722 (1906), since "a suppression of the truth may amount to a suggestion of falsehood". *Stewart v Wyoming Cattle Ranche Co,* 128 US 383, 388; 9 S Ct 101; 32 L Ed 439 (1888). In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure. See 37 Am Jur 2d, Fraud and Deceit, § 146.

In its original findings of November 4, 1977 the trial judge summarily dismissed defendants' silent fraud claim, holding that there was "no duty on the part of the plaintiff to make a disclosure of the waivers [of the remaining bond requirements], *they [sic] having no knowledge of the effect the original statements of Montie's had on the defendants' decision".* (Emphasis added.) On motion for reconsideration the trial court explained its ruling.

"It is true that *some of the conditions originally called for were not met. If any misrepresentation occurred, it was through a statement that they had been.* As I indicated in the finding, the proofs satisfy me:

"1. The statement of what would be required in order to issue the bond was true when made.

"2. It was not made in an attempt to induce the defendants to act, although in their minds it was in fact an inducement.

"3. The plaintiff neither knew nor had any reason to believe that defendants' actions were governed at all by its own requirements.

"4. *When the changes took place, there was no duty*

*on the part of the plaintiff to speak.* At that time and throughout, the defendants had conveyed two objections to the plaintiff—one that their wives should not be required to sign the indemnity agreement, to which the plaintiff acceded; two, that there be a list of priorities among the indemnitors, which request was denied. *Not knowing and not having reason to believe, that the defendants looked to the other conditions as 'running' to them, the plaintiff's silence cannot, in my judgment, be construed to have been breach of a duty to speak."* (Emphasis added.)

Thus the trial court concluded that plaintiff had no duty to notify defendants of the modification of the bond requirements because it found that USF &G did not know, nor reasonably should have known, that defendants were relying on the representations that all of the bond requirements had been satisfied. We find this premise to be clearly erroneous.

In the instant case the trial court specifically found that Montie and Neubacher were agents of USF&G. Therefore if the agents knew, or reasonably should have known, that defendants were relying on all the bond requirements being completed that knowledge is imputed to the principal, USF&G. Seavey, Law of Agency (West, 1964), § 97, p 174. See 1 Restatement Agency, 2d, § 272, p 591.

We hold that the trial court was clearly in error in finding that plaintiff did not know, nor reasonably should have known, of defendants' reliance. Defendants had discussed with both agents their concern over their potential liability under the indemnity agreement and were openly attempting to limit this liability by 1) making sure that all of the proposed indemnitors had signed the indemnity agreement and that the Jackson Bank had subordinated its security interest in Kwaske Brothers' assets; 2) attempting to establish a prior-

ity of collections clause; and 3) eliminating the requirement that their wives sign the indemnity agreement. Therefore we find that Montie and Neubacher, as professional insurance agents experienced in the drafting and execution of indemnity agreements, knew, or reasonably should have known, that defendants were relying on the representations that all the bond requirements had been satisfied. See Part III, *supra.*

Once this determination has been made it logically follows that the agents had a duty to disclose that all the bond requirements had not been met. "[O]ne who remains silent when fair dealing requires him to speak may be guilty of fraudulent concealment." *Nowicki v Podgorski,* 359 Mich 18, 32; 101 NW2d 371 (1960). It is the general rule "that a party to a business transaction is under an obligation to exercise reasonable care to disclose to the other party, before the transaction is consummated, any subsequently acquired information which he recognizes as rendering untrue, or misleading, previous representations which, when made, were true or believed to be true". *Strand v Librascope, Inc,* 197 F Supp 743, 754 (ED Mich, 1961). See *Wolfe v A E Kusterer & Co,* 269 Mich 424; 257 NW 729 (1934). Accord, 3 Restatement Torts, 2d, § 551(2)(c), p 119. When Montie and Neubacher discovered that their representations concerning the bond requirements were inaccurate, and because they knew that defendants were very concerned with whether all of the other parties had signed the indemnity agreement, the insurance agents had a duty to clearly inform defendants of the new situation. This duty may have been satisfied by the delivery of the USF&G letter to defendants on March 28, 1972 insofar as the letter put defendants on notice that certain

parties listed in the bond requirements had not signed the indemnity agreement as of February 4, 1972, the date the letter was written. In other words, the USF&G letter notified defendants that the December 1971 representations were not true when made. However, it is far from clear whether the letter was intended to, or actually did, alter defendants' reasonable understanding of plaintiff's previous and continual assurances that all of the bond requirements had been satisfied since the letter was delivered almost two months after it was written and called for the delivery of the remaining indemnity agreements "at an early date". (See Part V, *infra.*) Since neither the trial nor appellate court reviewed the issue of whether the duty to notify was satisfied and since this issue was not briefed by the parties, we reverse only the finding that there was no duty to inform and remand to the trial court for further consideration not inconsistent with this opinion. We note, however, that whether or not there was a satisfaction of the duty is closely aligned with the question of whether or not there was an effective misrepresentation, which is discussed next.

### V. Was There an Effective Misrepresentation?

We now turn to the record to determine whether defendants successfully proved a misrepresentation. In reviewing the findings of the trial court we are unable to ascertain whether the trial court believed that plaintiff made a misrepresentation that defendants relied upon.

The trial court found that on December 28, 1971, at the closing, plaintiff answered affirmatively to defendants' question whether all the coindemnitors had signed and the bank had subordinated its security interest in the Kwaske Brothers'

assets, thereby making a misrepresentation. Defendants became aware that the December, 1971 misrepresentation was, or had been, false when on March 28, 1972, Neubacher gave Black a photocopy of a letter he had received from USF&G Bond Superintendent Pohl. Since the letter indicated that certain bond requirements remained unfulfilled as of February 4, 1972, the date the letter was written, defendants became aware that any representations made prior to or at the December 28, 1971 closing that the bond conditions were fulfilled were false.[11] Thus after defendants received the USF&G letter on March 28, 1972 the December 1971 misrepresentations, in and of themselves, were no longer effective.

Defendants Black and Haughey, however, both claimed that Neubacher assured them upon the delivery of the USF&G letter, and subsequently, that all of the bond requirements had been satisfied since. the writing of the USF&G letter. Black was very definite and unequivocal as to what took place during Neubacher's visit:

*"[Plaintiff's Attorney Carter]:* So, is it not true, from reading this [letter], you were aware that the conditions that you were relying on had not at this time been satisfied?

---

[11] Whether this letter satisfied plaintiff's duties to clearly notify defendants that they could no longer rely on the statements that all the other parties to the indemnity agreement had signed, or were required to sign, is unclear. The letter directed Neubacher to promptly send the signed indemnity agreements of various recalcitrant parties to USF&G. Thus, even though the letter notified defendants that some of the bond requirements had not been met as of February 4, 1972 (two months prior to defendants' receipt of the letter) the letter also reaffirmed USF&G's policy that all of the bond requirements had to be met. Therefore, when delivering the letter to defendants Neubacher may have calmed any suspicions concerning prior misstatements by telling defendants that the other parties had since signed the agreement. Indeed, this is precisely what defendants contend.

*"[Defendant Black]:* On the contrary because *I asked Mr. Neubacher what the situation was.* That does not say that on March 28th that those were not available. It says on February 4th, they were not available. *Mr. Neubacher responded that those things had been taken care of and this, our signature, our indemnity was the only thing yet remaining,* and if you'll read it carefully, you'll find that it says that." (Emphasis added.)

Black later testified that he mailed a copy of the proposed indemnity agreement and the USF&G letter to his attorney with a handwritten note at the bottom describing the meeting with Neubacher. The note, dated March 28, 1972, and bearing a March 29, 1972 time stamp of the law office, in part stated:

"I told [Neubacher] the wives *would not* be expected to sign, and that we wanted assurance that we were limiting ourselves after Kwaske Bros. Constr. Co., Inc., and after the three brothers personally. He said thats *[sic]* what all these papers mean." (Emphasis in original.)

Neubacher admitted visiting defendants' office to discuss the signing of the indemnity agreement but denied stating that the bond requirements had been subsequently met.[12]

---

[12] Neubacher testified on direct examination:

*"Q. [Mr. Carter]:* You've heard testimony of Mr. Black this morning that you were at his office in Battle Creek on or about March 28 of 1972 and that you handed him or delivered to him Defendants' Exhibit O which I have just handed you. Do you recall meeting Mr. Black at his offices on March 28th of 1972?

*"A. [Neubacher]: I went to Battle Creek to his offices. I can't recall exactly what date. I know I did go to his office that one time.*

*"Q.* Do you recall delivering what's been marked as Defendants' Exhibit O to him?

*"A.* I can't recall if I delivered this to him or if it was mailed.

*"Q.* At the time which you met him, did you make any representation to him that all the conditions required for USF&G to issue the bonds had been met?

*"A. I never made that statement, no.*

The trial court nevertheless found that defendants failed to show, by clear, satisfactory and convincing evidence,[13] that oral assurances were made on March 28, 1972, declaring: "The equivocal nature of the defendants' testimony contrasted with the positive nature of Neubacher's does not convince me." However, at a later point in the decision, the trial judge declared: "I further find that statements made by Mr. Neubacher *subsequent* to the closing [December 28, 1971] would constitute a misrepresentation, although there was no evidence that it was an intentional one." (Emphasis added.)

The trial court's confusing and contradictory findings necessitate that we remand for clarification. The court found (1) there was a misrepresentation *on* December 28, 1971, (2) that defendants failed to prove by clear and convincing evidence that there was a misrepresentation on March 28, 1972, but (3) there were "statements made by Mr. Neubacher *subsequent* to the closing" of December 28, 1971 which "constitute a misrepresentation". Which statements made at what time remains unclear. If any of the misrepresentations "subsequent to the closing" were also made subsequent to the receipt of the USF&G letter on March 28, 1972 or February 4, 1972 (for the significance of the February 4, 1972 date see Black's testimony

"*Q.* You've heard testimony this morning by Mr. Haughey that probably at sometime after that March 28th meeting that you met with him in Battle Creek, did you?

"*A.* I don't believe I ever had a meeting with Mr. Haughey, himself. Most of my dealings were with Mr. Black.

"*Q.* Did you ever at any time represent to Mr. Haughey that the conditions which USF&G had required for issue of the bond had been satisfied?

"*A. No, sir.*" (Emphasis added.)

[13] See *Youngs v Tuttle Hill Corp,* 373 Mich 145, 147; 128 NW2d 472 (1964); *A & M Land Development Co v Miller,* 354 Mich 681, 686; 94 NW2d 197 (1959).

above), then defendants may have reasonably re-
lied on them and thereby have satisfied the first
element necessary to maintain their affirmative
defense of innocent misrepresentation. If, on the
other hand, the trial court finds that none of the
"statements made by Mr. Neubacher subsequent
to the closing" were made on or after March 28,
1972 or February 4, 1972 then there can be no
effective misrepresentation upon which defendants
could have reasonably relied.

Furthermore, the antepenultimate paragraph of
the trial judge's ten-page findings reads as follows:

"As a result, I find that preliminary statements were
made to the defendants and these were certainly a
factor in their decision to sign the indemnity agree-
ment."

Obviously if the statements exerted a material
influence on the final decision to sign the indem-
nity agreement, and, if they were false, as was the
case, then the only logical conclusion is that there
was an actionable misrepresentation.

However, the trial judge in the next paragraph
discusses the fact that plaintiff's misrepresenta-
tions were neither intentionally false nor made
with the intention that defendants should rely
upon them. Both propositions, of course, are extra-
neous to a consideration of innocent misrepresen-
tation and consequently legally erroneous if ap-
plied to the findings in the antepenultimate para-
graph.

Nonetheless, in the ultimate paragraph, the
trial judge finds "that the defendants have failed
to establish their affirmative defense". On the
basis of the two preceding paragraphs this is a
legally erroneous conclusion, and standing alone
would be subject to reversal. But these three criti-

cal paragraphs do not necessarily jibe with the rest of the trial judge's findings and only add to the confusion.

Therefore we remand to the trial court to find whether defendants reasonably relied upon misrepresentations made by plaintiff or his agents at the time of their signing the indemnity agreement. The trial court shall provide defendants an opportunity to present evidence concerning the discussions between the parties over establishing a priority of collection among the indemnitors.[14] Insofar as the defendants no longer allege that a priority arrangement was contracted, the testimony presented shall only be considered for its probative value concerning 1) whether there were subsequent misrepresentations that the bond requirements had been satisfied, 2) whether defendants

[14] Defendants had claimed in their answer that the indemnity agreement contained a priority of collections clause. In fact, however, the clause was in an earlier proposed draft of the agreement which plaintiff had refused to accept. The impasse was resolved when plaintiff agreed not to require defendants' wives to become indemnitors in exchange for defendants agreeing to sign the indemnity agreement without demanding a priority of collection clause. When defense counsel realized that he had mistakenly read the wrong agreement in answering the complaint he abandoned the priority defense. Thus plaintiff objected to the admission of testimony concerning past discussion between the parties concerning priority of collection among the indemnitors. Defense counsel unsuccessfully attempted to explain his position to the court:

"*The Court:* What is the materiality of [the statements by agent Montie suggesting the possibility of arranging for a priority of collection]?

"*Mr. McFee:* Well, from the standpoint that *there were to be other Kwaskes on the agreement and all of these people were on the master surety agreement.*

"*The Court:* I think, if I understand your objection, Mr. Carter, to this specific question as to whether there was to be some priority to demand for liability.

"*Mr. McFee:* We are not alleging that there was to be any specific priority, but I'm saying this was part of the conversation that took place at that time and it *shows how important these representations were to my client's mind,* all of these things.

"*The Court:* I'm going to sustain the objection. I don't see the materiality of it." (Emphasis added.)

were concerned with the scope of their potential liability and communicated this to plaintiff through its agents, and 3) whether the defendants acted in reliance on the fact that there would be other indemnitors to the agreement.

## VI. REMEDY

Should the trial court find defendants have satisfied their burden of proof in raising the affirmative defense of innocent misrepresentation or that there was silent fraud, then the court will be given the task of awarding an appropriate remedy. Defendants seek to have the entire indemnity agreement set aside, arguing that "it is only equitable to void the agreement when it is determined that the assurances were false". Plaintiff, on the other hand, argues that the indemnity agreement should be enforced as written.

The defenses of innocent misrepresentation and silent fraud are not based in law but in equity. The equitable court awarding a remedy must look to the most just result. Therefore, should the court on remand find there was innocent misrepresentation or silent fraud it must decide which remedy would be the most equitable under the unique circumstances of the case. The court is not confined to the polar opposite remedies urged by the opposing parties: full enforcement or total abrogation of the indemnity agreement. Other remedies, such as reformation, restitution, or partial enforcement of the contract, may be examined. We leave the resolution of the proper remedy, if any, to the court below.

## CONCLUSION

The Court of Appeals erred in attempting to

decide a case of innocent misrepresentation on the
basis of failure to prove an element required only
in the traditional common-law rule of misrepresen-
tation but not in the innocent misrepresentation
rule. Its judgment is consequently reversed. The
trial court erred in the same particular. It in
addition erred in misapplying the *Callihan* rule as
to what constitutes reliance on a misrepresenta-
tion. It also erred in misapplying the rule of silent
fraud. Therefore, we remand for consideration
whether plaintiff satisfied its duty to inform defen-
dants that the earlier representations that all of
the bond requirements had been satisfied were
false in finding plaintiff knew or reasonably should
have known of defendants' reliance on the misrep-
resentation. Finally, we are unable to read the
trial court's findings as to whether or not there
was an effective misrepresentation. For these rea-
sons we reverse and remand to the trial court to
reconsider the case in the light of the rulings of
law we have made and to clarify its findings on
the fact of misrepresentation. In case it finds there
was in fact an actionable misrepresentation we
have provided the trial court some guidance on the
nature of the remedy that would be appropriate.

LEVIN, FITZGERALD, and BLAIR MOODY, JR., JJ.,
concurred with WILLIAMS, J.

KAVANAGH, J. *(for remand).* I agree that this
matter must be remanded, for it is not clear what
facts the trial court found as a basis for his deci-
sion.

I write separately, however, because I fear the
discussions of "innocent misrepresentation" and
"fraudulent misrepresentation" and "silent fraud"
will confound the confusion which has marked the
handling of this case. However valid or important

such distinctions might be in suits for damages, the claim of misrepresentation here is asserted as a defense in a suit to enforce a contract.

Plaintiff's suit to enforce the indemnity contract is resisted by defendants' claim that they were induced to enter into the contract by the misrepresentations of the plaintiff's agents.

If the trial court finds that the plaintiff

1) Made a representation of a material fact,

2) That such representation was false,

3) That the defendants relied on such representation as all or part of the inducement to enter into the contract, *Converse v Blumrich,* 14 Mich 109; 90 Am Dec 230 (1866), he should grant relief to the defendants.

Unless the trial court makes all the above findings, he should enforce the contract.

Ryan, J., concurred with Kavanagh, J.

Coleman, C.J., did not participate in the decision of this case.